144 So.2d 544 (1962)
Alma P. FAVALORA
v.
AETNA CASUALTY & SURETY COMPANY et al.
No. 5575.
Court of Appeal of Louisiana, First Circuit.
June 29, 1962.
Rehearing Denied September 25, 1962.
Certiorari Denied November 8, 1962.
*545 Frank W. Middleton, Jr. (of Taylor, Porter, Brooks, Fuller & Phillips), Baton Rouge, for defendant-appellant.
Kantrow, Spaht & Kleinpeter, by Robert L. Kleinpeter, Baton Rouge, for defendant-appellee.
Boris F. Navratil, Baton Rouge, for plaintiff-appellant.
Before LOTTINGER, LANDRY and REID.
LANDRY, Judge.
Having sustained personal injuries as the result of a fall in the radiology room of the Baton Rouge General Hospital, plaintiff, Alma P. Favalora, instituted this action against Dr. Richard C. Boyer, Radiologist; Aetna Casualty & Surety Company (sometimes hereinafter referred to as "Aetna"), Boyer's insurer; The Baton Rouge General Hospital (sometimes hereinafter referred to as "the Hospital"); and Hartford Accident and Indemnity Company (sometimes hereinafter referred to as "Hartford"), liability insurer of the Hospital, to recover damages for the injuries *546 thus sustained and related medical expense. An exception of no right and no cause of action (predicated on the ground of charitable immunity) was filed on behalf of the Hospital and sustained by the court below. After trial on the merits judgment was rendered in favor of plaintiff and against defendant Aetna in the aggregate of $20,659.28. Plaintiff's demand was rejected as to defendants Boyer and Hartford.
Aetna has appealed contending (1) that the judgment against it was erroneous because its insured, Boyer, was free of negligence; and (2) alternatively, judgment should be rendered against defendants Aetna and Hartford, in solido because a partnership allegedly existed between Boyer and the Hospital thereby rendering the Hospital's insurer liable. Plaintiff has appealed devolutively praying (1) that the award for personal injuries in her favor be increased from $12,500.00 to $15,000.00; (2) that she recover judgment against defendants, Boyer, Aetna and Hartford, in solido and (3) that the fees of certain medical experts who testified on the trial of this matter be increased. It is conceded by all parties that the Hospital may not be cast in judgment because of its exemption from tort liability under the doctrine of charitable immunity. Hartford also concedes that the immunity of its said insured may not be plead in defense of plaintiff's claim against said insurer.
The issues presented by these appeals are as follows:
(1) Aetna and Hartford contend that the accident and resulting injury to plaintiff did not occur by virtue of any negligence or lack of ability, care, skill or diligence on the part of the radiologist (Dr. Boyer) or any of the hospital personnel; (2) Plaintiff maintains the injury sustained resulted from the negligence of both the radiologist and certain hospital personnel thereby rendering the hospital liable in solido with Dr. Boyer and the latter's insurer, Hartford; alternatively, plaintiff maintains solidary liability existed between the radiologist Boyer and the Hospital; (3) Hartford contends that if a partnership relationship existed between the radiologist and the Hospital it was not of the type which imposed solidary liability upon its members; (4) The question of quantum; plaintiff seeks an increase in the award while defendants alternatively pray for a reduction therein; and (5) An increase in the fees awarded the medical experts, Doctors Tanna and Halley.
On July 15, 1959, plaintiff, who was then 71 years of age and engaged in the operation of a small mercantile establishment, consulted her regular physician, Dr. Jerome F. Tanna, whose field is general surgery, complaining of stomach pains, general fatigue and an episode of fainting or "passing out". Believing that plaintiff was in need of a general check up, Dr. Tanna admitted her to the Baton Rouge General Hospital on the evening of July 15, for X-ray and fluoroscopic examination of the chest, gall bladder and gastrointestinal tract (known as a G. I. Series) the following day. Hospitalization was required because the gall bladder and G. I. series examinations desired by Dr. Tanna necessitated preparations consisting of fasting from the previous evening meal until the examination the ensuing morning and the ingestion of six dye tablets the night before the examination to enable the taking and interpretation of the X-rays ordered by plaintiff's said physician. At the time plaintiff entered the Hospital she was fully ambulatory. Her hospitalization was in no way due to physical incapacity nor was she institutionalized for treatment of any nature.
The morning following her admission to the hospital, Mrs. Favaloro though ambulatory was taken from her room in a wheel chair to the X-ray or radiology department. Chest and gall bladder X-rays were made the last of which, according to normal practice and procedure was taken with plaintiff in a prone position on a stretcher which device the record shows to be in reality a wheeled cart. Plaintiff was then taken into *547 the hall outside where she remained lying on the stretcher while the radiology room was readied for the G. I. series scheduled by Dr. Tanna. When preparations for the G. I. series were completed, two technicians, whose duty it was to assist the radiologist, brought plaintiff into the X-ray room on the stretcher and helped plaintiff off the stretcher by means of a footstool. Plaintiff then walked a few feet to a nearby chair on which she sat to await the arrival of the radiologist. One of the technicians left the room taking the stretcher with him.
The radiologist, Dr. Richard C. Boyer, then entered the room and was introduced to plaintiff by the technician. Plaintiff was then instructed to walk to the X-ray table and stand on the footboard. The record shows an X-ray table to be a mechanical device upon which the patient either stands or lies while undergoing X-ray examination. It is so constructed that it can be tilted at any angle from horizontal to vertical. It has a footboard or step on one end to support the weight of the patient when X-rays are taken in a vertical position. With the table aligned for a vertical picture or X-ray, the patient stands upon the footboard which in this position is approximately one and one-half inches above the floor. In the vertical position the patient stands with his back to the table facing the radiologist who is normally seated facing the fluoroscopic screen which is placed between the patient and the radiologist. The examination procedure does not require that the radiologist keep his hands on the patient at all times although it does necessitate his frequently touching the patient for palpation or to alter the patient's position so that the patient may be viewed from the various angles which the examination demands. Within easy reach of the radiologist is situated a switch which turns off the room lights and simultaneously places the fluoroscope in operation and also a control by which he may manipulate the X-ray table to any desired angle. When the room lights are turned off sufficient light is provided from the fluorosocpic screen and a dim overhead light which remains burning that a dim outline of the patient may be seen at all times. With plaintiff in the vertical position described, the technician handed her a glass of barium which the examination required that she swallow, the room lights were turned off, plaintiff was instructed to drink the barium and an X-ray picture was taken of her esophagus. A second cup of barium was handed plaintiff by the technician who then took the exposed film to a nearby pass-box leading to the adjacent dark room, obtained a new film and the X-ray process repeated. While the technician was depositing the second exposed film in the pass-box, plaintiff suddenly and unexpectedly fainted and fell to the floor. Dr. Boyer was unable to recall whether he was looking into the fluoroscopic screen at the time plaintiff's image suddenly disappeared or whether his attention was momentarily diverted from plaintiff by some phase of the examination procedure. In any event, he did not see plaintiff fall nor did he detect any evidence of distress. The technician present heard Dr. Boyer exclaim and heard a noise. He immediately turned on the lights and saw plaintiff lying on her side on the floor.
Dr. Boyer instantly began administering to plaintiff while the technician summoned additional assistance. Plaintiff was placed on the X-ray table and X-rays were taken of those portions of plaintiff's anatomy which indicated the possibility of injury, namely, her skull, shoulder and pelvis. The pictures revealed a fracture of the neck of the right femur which subsequently required open reduction and the insertion of a metal pin or nail by an orthopedic surgeon. As a result of the immobilization and hospitalization for her injuries, a pre-existing vascular condition was aggravated causing a pulmonary embolism which in turn necessitated additional surgery for the litigation of the inferior vena cava which the record shows to be a rather large deep-seated vein situated in the lower extremities.
*548 Certain procedures required during plaintiff's hospitalization for her injury and the complication attributable thereto resulted in a kidney infection which further prolonged her institutionalization and resulted in total medical expenses of $8,159.28.
To escape liability herein defendants rely upon the pronouncements contained in Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781, which states the duty of care owed by a physician to his patient to be as follows:
"(1) A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, 31 So. 303; Roark v. Peters, 162 La. 111, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La. App., 19 So.2d 901; Wells v. McGehee, La.App., 39 So.2d 196. See also 70 C. J.S. Physicians and Surgeons § 41.
As contended by counsel for appellant the foregoing quotation from the Meyer case, supra, establishes the rule that the duty owed plaintiff herein was that degree of skill and care usually exercised by similar practitioners in the same locality or community. In addition, however, to escape liability herein defendant must show not only that he possessed the required skill and competence but also that in applying that skill to plaintiff he used reasonable care and diligence along with his best judgment concerning those phases and aspects of the examination which may affect plaintiff's health, safety and personal welfare.
Learned counsel for appellant concedes the general law applicable in the case at bar is that a physician, surgeon or dentist is not required to exercise the highest degree of skill possible and is held only to the duty of exercising care and skill commensurate with that ordinarily employed under similar circumstances by the members of his profession in good standing in the same community or locality and to use reasonable care and diligence along with his best judgment. Counsel argues, however, that in addition to the foregoing duty, a physician owes his patient the additional obligation of using the most effective preventative means available to safeguard and protect the patient against the possibility of injury from a known hazard or danger. Able counsel for plaintiff argues that in the instant case there was a departure from accepted medical standards and practice in that there was a cursory inadequate pre-examination of plaintiff. In this connection counsel argues that had the radiologist, technician and certain hospital employees taken a medical history of plaintiff it would have revealed the increased possibility of plaintiff fainting during the course of the examination. Counsel further argues the radiologist and technician were negligent in failing to take into consideration certain known facts concerning plaintiff such as her age, her having fasted for twelve hours or more and her having spent approximately one and one-half hours undergoing radiological examination all of which circumstances should have alerted Dr. Boyer to the danger of plaintiff's fainting. Finally counsel argues that in the instant case there was a departure from the standard of care adopted by other radiologists during similar examinations which standard demanded that Dr. Boyer remain sufficiently alert and attentive of plaintiff to guard against the possibility of her fainting irrespective of whether the likelihood of her fainting was greater or lesser than normal.
In the instant case Dr. Joseph P. Tomsula, senior radiologist at Our Lady of the Lake *549 Hospital, Baton Rouge, and Dr. Louis J. Bristow, chief radiologist at the Baptist Hospital, New Orleans, as well as Dr. Boyer, testified that persons undergoing fluoroscopic examination while standing sometimes, although rarely, do faint and that fainting is a possibility which the radiologist and technician must constantly be on the lookout for and guard against. In addition the testimony of the three medical experts further discloses that in the course of training given radiologists and the technicians who assist them, the possibility of a patient fainting is a matter about which they are instructed and cautioned to be constantly on guard against. It further appears that if advance signs of fainting are detected such as by an outcry or complaint of dizziness from the patient or by observation of unusual muscular reaction noted by the radiologist in the fluoroscopic screen, the radiologist may timely tilt the table to a horizontal position thus preventing the patient from falling. In those instances wherein fainting occurs without such advance warning the radiologist and technician attempt to catch the patient in time and pin him against the table or otherwise hold and support the patient and thereby avoid a fall. Each of the experts testifying in the case at bar experienced a very small number of fainting patients and each had succeeded in avoiding injury to such patients by catching the patients before they fell to the floor. From the record it appears that in such instances the radiologists rely completely upon their alertness and ability of movement to prevent injury to the patient who faints.
As a breach of professional standards of care it is suggested that the radiologist and technician should have known that plaintiff was likely to faint without audible or visible advance warning. In this connection we note that in their answers defendants alternatively plead contributory negligence on the part of plaintiff based upon her failure to warn the radiologist and technician of her physical condition, her failure to cry out or request aid and her failure to support herself in some manner upon realizing she was about to faint. We further note that these alternative pleas are not re-urged on appeal.
Plaintiff's hospital admission sheet contains the following information which was dictated by her personal physician, Dr. Jerome F. Tanna:
"Loss of weight, pain in stomach.
"For the past several days patient has been complaining of feeling tired, and has had an episode of `passing out'. She deserves diagnostic workup."
The record herein establishes, however, that the foregoing information was not made available to the hospital prior to the accident in question. The testimony of Dr. Tanna is to the effect that in accordance with local custom the quoted data on plaintiff's admission sheet was dictated by him into a recording device situated in the hospital record room. Dr. Tanna was reasonably certain that the information in question was not placed on plaintiff's admission sheet until after the accident.
The record reveals that what the radiologist in the instant case received was an order, requisition or request for X-rays. It also appears that in the case at bar the radiologist and technician based their judgment of the patient's ability to undergo the examination while standing in part upon an entry on the order, requisition or request for X-rays indicating that the patient was to be brought to the radiology department in a wheel chair. This notation, according to the radiologist and technician indicated the patient's ability to stand. In addition their conclusion that plaintiff could stand during the examination was predicated upon visual observation of plaintiff's condition and routine oral examination consisting of questions regarding her ability to stand and walk. This observation, however, did not appear to be particularly close in the instant case considering it did not disclose that plaintiff habitually limped due to an old hip injury.
*550 Of particular importance is the fact that on the order, requisition or request for X-ray which was sent to the radiology room there is contained a space for the entry of the patient's clinical history. It is not customary in the hospital to enter any information concerning the patient's clinical history unless the patient is either bleeding or suffering from a cardiac condition. In this connection we note the most interesting and enlightening testimony of Dr. Tomsula appearing in the record:
"Q I gather then, doctor, that in your hospital and others with which you are familiar it is not customary to have the attending physician consult with the radiologist or furnish any clinical data or send down the chart, or anything of that nature with regard to an examination unless the attending physician feels that with his knowledge of the case that such is indicated.
"A I think you can say that that is a general trend or fault in private hospitals, in teaching institutions, because they have residents and teachers and interns and they've got to teach them to do things right. They insist that information is on the request and usually in some of those places it's a little different, but in my experience with private institutions they will call you on the phone, they will tell you that I am sending you this patient or that one, or I'm looking for this, I don't expect you to have any difficulty, and you go on that premise, or they will put a little note, very cryptic, on the request that the patient is bleeding, and you are on your own."
From the foregoing it is obvious that the witness considers the failure to require clinical data on the order, requisition or request for X-rays as a fault of private institutions tantamount to negligence. In this conclusion we heartily concur for reasons which will hereinafter be set forth.
The fact that medical instructional institutions require and insist that the patient's clinical history be placed on a request for X-ray examination indicates not the general standards of the profession in the private practice of radiology but that those charged with the responsibility of training radiologists recognize the need for a clinical history of a patient about to undergo X-ray examination even though in private institutions radiologists are willing to conduct their examinations without the benefit of a patient's clinical record. It appears reasonably certain from the record that had a clinical history been taken of plaintiff, it would have revealed that one of the reasons for her examination was to determine, if possible, the cause of her having fainted. Although plaintiff could have volunteered such information, it is clearly shown that she was not questioned with respect thereto. She was under no duty to reiterate her entire medical history to each of the hospital personnel with whom she came in contact but was entitled to rely upon the skill of her personal physician and the competence of the specialists into whose care and keeping she had been committed for examination. Lacking the specialized training of the hospital personnel, she could hardly be expected to select and communicate to her examiners the pertinent and relevant aspects of her medical history. However, the specialists conducting the highly technical examination involved could reasonably be expected to both know what information was important to the examination and plaintiff's general welfare as well as elicit same from plaintiff before commencing the tests ordered.
We believe that conformity with the standard of care observed by other medical authorities in good standing in the same community cannot be availed of as a defense in a malpractice action when the criterion relied upon is shown to constitute negligence in that it fails to guard against injury to the patient from a reasonably foreseeable contingency. In the case at bar it is shown by a member of the profession from defendant's locality that whereas the procedure followed by defendant *551 is indeed practiced by other members in the same field in the community, nevertheless, it is recognized by members of the same profession not only as being faulty but also contrary to what members of the profession have been taught in medical institutions of learning. The soundness of requiring a clinical history of patients scheduled to undergo such extensive radiological examination readily impresses this court considering the many factors which may affect the physical well-being of an individual subjected to the tests plaintiff was required to undergo. Not the least important of said factors is the possibility of radium poisoning resulting from overexposure to gamma rays as a result of repeated radiological tests. It would appear that even a superficial clinical history would be of considerable value to the radiologist and assisting technicians in determining, among other things, the patient's ability to stand without incident during such prolonged examination.
To relieve a member of the medical profession from liability for injury to a patient on the ground that he followed a degree or standard of care practiced by others in the same locality is, in our opinion, unthinkable when the degree or standard of care in question is shown to constitute negligence because it fails to meet the test of reasonable care and diligence required of the medical profession. To hold otherwise is to exempt one from even willful negligence on the patently unsound ground that others in the same profession do likewise. Such instances, in our judgment, do not involve errors of judgment or diagnosis occasioned by a disparity of innate skill and ability against which the law affords the physician protection, but rather constitutes failure of the physician to exercise reasonable care and diligence along with his best judgment in his application to the patient of the degree of skill of which he is possessed.
The rationale of the general rule which exempts from liability the physician or surgeon who employs the degree of care and skill ordinarily employed, under similar circumstances, by members of his profession in good standing in the community, is founded upon recognition of the fundamental truth that all individuals in the same profession (or any field thereof) are not endowed with the same degree of skill, ability, competence and proficiency. The rule rightfully makes allowance for the difference in human intelligence and the well known fact that the Divine Creator has seen fit to bestow upon His creatures varying degrees of ability and talent. It also takes into consideration the obvious fact that all members of the medical profession do not possess skill equal to their most learned and gifted brothers. In short, the general rule applicable herein makes allowance for the fact that not all medical authorities are equal in ability; it does not require of every member of the profession competence equal to the best but only that he follow those practices indulged in by similar practitioners in his locality exercising the greatest skill of which he individually is capable and at the same time exercising reasonable care and diligence together with his best judgment in the application of the skill he possesses.
We fail to see wherein our holding that a member of the profession may not avoid liability to a patient on the ground that he followed a custom or procedure of other similar practitioners in the community when such practice is shown to constitute negligence does violence to the general rule which we concede to be applicable to the instant case. We are firm in the opinion that it is patently absurd, unreasonable and arbitrary to hold that immunity from tort liability may be predicated upon a degree of care or procedure amounting to negligence notwithstanding such procedure is generally followed by other members of the profession in good standing in the same community. Stated otherwise, we deem it unsound to hold that immunity may be based on failure to take a known precaution for the safety and welfare of a patient on the ground that others in the profession follow *552 a similar course. It appears to us that such conduct is a clear violation of that provision of the rule which requires that the practitioner exercise reasonable care and skill together with his best judgment.
We believe that the practitioner who pursues a course or procedure shown to constitute negligence in that it falls short of his exercise of reasonable care and diligence along with his best judgment in the application of his personal skill, may find no refuge in the fact that others in the same profession do likewise. In so doing he has failed the patient in that he has neglected to exercise reasonable care and skill together with his best judgment.
In the case at bar we believe the failure of the radiologist to secure plaintiff's medical history prior to commencing the examinations was negligence constituting a proximate cause of the accident. Had such a history been taken it would (or should) have disclosed that one of the purposes of the examinations was to determine, if possible, the reason why plaintiff was subject to fainting. We have little doubt but that the disclosure of such information would have prompted an increased alertness on the part of the radiologist and technician involved herein.
We believe the record discloses additional negligence on the part of the radiologist which negligence we shall proceed to discuss.
In the case at bar the medical evidence shows that persons undergoing such examinations do on occasion faint. Although fainting is shown to occur in only a small percentage of cases, it nevertheless clearly appears that the possibility of fainting is to be anticipated in the case of any patient irrespective of age or physical condition. The likelihood of any patient fainting while undergoing such examination is conceded to be a matter to which attention is given in the course of training radiologists, technicians and attendants who perform and assist in such examinations. The evidence in this case leaves no doubt in the mind of this court that the likelihood of any patient fainting while undergoing the examination involved is a reasonably foreseeable eventuality to be guarded against.
Under the circumstances shown, reasonable care and best judgment require precautions which will prevent injury to the person who faints. The patient must in some manner be prevented from falling or the immediate surrounding area somehow rendered safe so that injury will not result to the patient permitted to fall to the floor.
The record discloses that under the procedure followed herein a patient who fainted could be prevented from falling by one of three methods. The patient could either be (1) secured to the table by a strap or other similar device; (2) supported by an attendant who remained constantly at the side of the patient; or (3) the radiologist, technician and other attendants present (if any) must remain so alert and attentive as to be able to come to the patient's assistance even if fainting occurred without advance warning. Defendant herein knowing of the reasonably foreseeable possibility that plaintiff might faint chose the latter preventive measure the efficacy of which obviously depended solely upon his ability to detect signs of indisposition and his physical ability to react thereto and timely come to plaintiff's aid. That defendant did not remain so alert is evident from the fact that plaintiff sustained a fall. Of considerable significance is the fact that the radiologist was not aware of plaintiff's predicament and was unable to tell precisely why or when plaintiff fell. Dr. Boyer testified in substance that all of a sudden he was aware that plaintiff was no longer standing before the screen. He was not certain whether plaintiff fell while he was observing her through the machine or whether the mishap occurred when he turned aside for some purpose connected with the examination procedure. It is obvious, therefore, that he did not discharge the assumed duty of remaining so alert as to prevent plaintiff's inevitable fall should plaintiff experience *553 a sudden fainting spell which, for reasons hereinabove shown, was entirely foreseeable. In view of the lack of other precautions for plaintiff's safety in the event of a weak spell, the only means which could have prevented plaintiff's fall was the ability of defendant to observe plaintiff's condition in time and his agility to respond to the emergency and prevent her fall. The negligence of Dr. Boyer, therefore, consisted not in his lack of skill or competence but in his failure to exercise due care by neglecting to remain sufficiently alert to a reasonably foreseeable expectancy the occurrence of which was calculated to cause injury to plaintiff.
Illustrious counsel for plaintiff maintains that Hartford should have been cast in solido with Aetna on either or both the following grounds: (1) a partnership existed between the radiologists and the Hospital thereby rendering said parties liable under the holding in Thomas v. Lobrano, La.App., 76 So.2d 599 and (2) the employees of the hospital acting within the scope and during the course of their employment were guilty of independent negligence in (a) failing to secure a clinical history of plaintiff and (b) failing to take precautions against the possibility that plaintiff might faint during the course of the examinations.
The evidence herein shows that Doctor Boyer and Dr. Thomas R. Ramsey, Radiologists, contracted with the Hospital for the operation of the Hospital's Department of Radiology. Pursuant to the agreement, the Hospital furnished office space and X-ray and radium facilities for the exclusive use of the aforementioned radiologists. Net proceeds derived from the operation of the Department of Radiology after deduction of all expenses including, by way of extension and illustration, salaries of technicians, purchase, operation and maintenance of equipment, billing and collecting services, were to be divided on the basis of 40% to the Hospital and 60% to Doctors Boyer and Ramsey. It is shown beyond the possibility of dispute that operation of the Radiology Department is an integral part of the services offered by the Hospital. In the case at bar preparations for plaintiff's radiological examinations were made on another floor of the Hospital where plaintiff spent the night previous to her tests. The request or order for X-ray examination was filled out in part by various hospital personnel, primary responsibility for which rested upon the nurse in charge of the floor to which plaintiff was assigned. Clearly, therefore, it was the duty of the hospital, through its employees charged with responsibility therefor, to take adequate precaution for plaintiff's safety.
While the Lobrano case, supra, relied upon and cited by counsel for appellee does contain language to the effect that under an arrangement similar to that herein involved, liability was therein imposed upon the hospital on the theory that a partnership existed between the radiologist and hospital involved, a careful reading of that decision reveals that the court therein also expressly found that an employee of the hospital was guilty of negligence which contributed to the injuries for which plaintiff sought damages. More specifically, the court therein found that the operation of a radiology department under circumstances almost identical to those in the case at bar, constituted the radiologist an employee of the hospital.
We are unaware of any prior jurisprudence which expressly establishes the duty or degree of care owed by nurses and technicians to patients to whom their services are rendered. The only cases brought to our attention, namely, Jordan v. Touro Infirmary, La.App., 123 So. 726 and Wells v. McGehee, La.App., 39 So.2d 196, while dealing with alleged negligence of a nurse, make no mention of the rule regarding the degree of care owed by nurses to patients in their charge and keeping. We have had occasion to consider this identical question with respect to nurses in Norton et al. v. Argonaut Insurance Company et al., La.App., 144 So.2d 249. In the Norton *554 case, supra, we concluded, for reasons therein set forth, that the rule applicable to physicians is equally applicable to nurses. Upon the authority cited in the Norton case, supra, we see no valid reason why the same rule should not apply to technicians, attendants, and practitioners engaged in all kindred and related branches and fields of the medical profession. We herein hold that the rule does so apply.
In the case at bar it is readily conceded that the floor nurse whose duty it was to fill out plaintiff's requisition card was an employee of defendant Hospital. Likewise, it is conceded that the technician who assisted Dr. Boyer was also an employee of the Hospital. In the instant case had the floor nurse secured a clinical history of plaintiff and entered it in the space reserved on the requisition slip for this specific purpose the radiologist would have been alerted to the peculiar circumstances surrounding plaintiff's admission for diagostic purposes, namely, that, inter alia, she was subject to fainting spells. In addition to the negligence of the Hospital's employees in failing to take a clinical history of plaintiff, we note other negligence on the part of the technicians whose duty it was to assist the radiologist. The record herein leaves not the slightest doubt but that the technicians are highly trained in their particular field. It further appears that during their training they are expressly instructed and cautioned to guard against the possibility that a patient may faint. It further appears that the technician who was in the radiology room at the time of plaintiff's fall was a trained and skilled individual who had been engaged in the field for quite some time. The duty of the technician, under the circumstances, appears virtually synonymous to that of the radiologist. He is charged with knowledge by training and experience that any patient may faint and is consequently impressed with the duty of being on the alert for such possibility. He bears the burden of assisting the radiologist in guarding against such an eventuality. In the instant case the employees of the hospital did not discharge the duties incumbent upon them. It also appears that the other technician left the radiology room when the tests commenced. It is not shown that his services were required in other parts of the hospital. Insofar as the record of the instant case is concerned there appears no reason why he should not have remained in the radiology room to assist in the procedure if necessary. Had he remained present it may well be that plaintiff's fall would not have occurred. Under the circumstances shown it is clear that the negligence of the Hospital's employees concurred in and contributed to plaintiff's injury thereby rendering defendant Hartford liable in solido with Aetna and the latter's insured.
We believe it unnecessary to place the hospital's liability on the basis of partnership as counsel for appellants suggests was done in the Lobrano case, supra. Nor do we find it necessary to construe the relationship of the parties to be a joint venture as was held in Fossier v. American Printing Co., Ltd., La.App., 130 So.2d 529. We believe the sounder view to be that both the hospital and radiologist breached a duty of care owed plaintiff herein. The law of this state is well settled to the effect that all persons whose negligence concurred in and contributed to a plaintiff's injuries are liable in solido therefor. Abrego v. Tri-State Transit Co., 22 So.2d 681; Huguet v. Louisiana Power & Light Co., 196 La. 771, 200 So. 141; LSA-C.C. Article 2324.
We see no valid reason why the quantum allowed for plaintiff's personal injuries should be reduced in the case presently under consideration. As a result of her fall plaintiff sustained a trauma to her shoulder and an impacted fracture of the neck of her right femur which latter injury was reduced by surgery and insertion of a metal nail. Because of the reluctance of plaintiff's surgeon to submit her to additional surgery, the nail has never been removed. The head of the nail, protruding from the femur bone, was still occasioning plaintiff some pain and discomfort more *555 than a year following the accident. As a result of the fracture plaintiff was hospitalized for a period of twenty-one days. Shortly following her initial discharge she was readmitted to the hospital because of pulmonary embolism which the medical evidence attributes to the preceding surgery necessary to reduce the fracture and plaintiff's immobilization incident thereto. It appears that the surgery and subsequent confinement aggravated and activated a pre-existing but dormant inflammatory vascular condition of the lower extremities with which plaintiff was afflicted. The embolism which plaintiff sustained is shown to have been a lodging in her lung of a blood clot which formed in one of the veins of her lower extremities and which had become dislodged, entered the blood stream and was carried into the lungs. Such a complication is shown to often result in a fatality. In plaintiff's case it was sufficiently grave to prompt Dr. Tanna to resort to surgery wherein he opened plaintiff's abdominal cavity and tied off the inferior vena cava (a rather large vein) to prevent the occurrence of another embolism. Plaintiff's hospitalization for this latter surgery lasted for a period of 33 days. During this period plaintiff had to repeatedly undergo catherization which procedure in addition to being unpleasant, discomforting and painful resulted in further complicating plaintiff's condition in that it caused infection in both kidneys. For a period of approximately four and one-half months following her injury plaintiff was unable to walk. Subsequently she was readmitted to the hospital for a period of five days for physiotherapy designed to restore her ability to ambulate. The record leaves no doubt that plaintiff has suffered considerably from her injuries and the resulting complications. In view of the nature and extent of plaintiff's injuries we feel that the award of $12,500.00 allowed by the lower court is fair and reasonable. Plaintiff incurred medical expenses in the aggregate of $8,159.28 all of which is amply supported by evidence in the record. The trial court properly allowed recovery of that amount.
The learned trial court also fixed the fees of each medical expert who testified at the sum of $50.00. It appears, however, that in the case of Dr. Jerome F. Tanna, the witness appeared in court on two separate occasions. We agree with learned counsel for appellee that under those circumstances the fees allowed Dr. Tanna should be increased to $100.00 The fee of $50.00 allowed the other experts, however, appears reasonable and will not be disturbed.
For the reasons hereinabove set forth, it is ordered, adjudged and decreed that the judgment of the lower court be and the same is hereby amended and judgment rendered herein in favor of plaintiff, Alma P. Favalora, and against defendants, Dr. Richard C. Boyer, Aetna Casualty & Surety Company and Hartford Accident & Indemnity Company, in solido in the full sum of TWENTY THOUSAND SIX HUNDRED FIFTY-NINE and 28/100 ($20,659.28) DOLLARS, together with interest thereon at the rate of Five (5%) per cent per annum from date of judicial demand, until paid.
It is further ordered, adjudged and decreed that the expert witness fees of Dr. Jerome F. Tanna be and they are hereby fixed at the sum of ONE HUNDRED and 00/100 ($100.00) DOLLARS, and taxed as costs herein.
It is further ordered, adjudged and decreed that except as herein amended the judgment of the trial court be and the same is hereby affirmed.
It is further ordered, adjudged and decreed that all costs in the trial court as well as the costs of this appeal be paid by the defendants cast herein.
Amended and affirmed.

ON APPLICATION AND SUPPLEMENTAL APPLICATION FOR REHEARING
PER CURIAM.
Defendant-appellant, Aetna Casualty & Surety Company, on application and *556 supplemental application for rehearing has, inter alia, complained that in our original decree we inadvertently rendered judgment herein against its insured Dr. Richard C. Boyer, despite the fact said insured was not made a party to these proceedings.
The obvious gravity of such alleged error has prompted our re-examination of the record to determine the correctness thereof. We acknowledge counsel's position in this regard to be supported by the record herein.
It is elementary that judgment may not be rendered against a person not made party to a legal proceeding.
Accordingly, it is ordered, adjudged and decreed that the judgment previously rendered herein in favor of plaintiff, Alma P. Favalora, be and the same is hereby annulled, reversed, rescinded and set aside insofar as it casts Dr. Richard C. Boyer in damages, and in all other respects affirmed.
Application and supplemental application for rehearing denied.