242 So.2d 650 (1970)
John L. SLACK et ux.
v.
Dr. A. K. FLEET et al.
No. 8140.
Court of Appeal of Louisiana, First Circuit.
December 21, 1970.
*651 F. Louis Gonzales, Joel B. Dickinson, Baton Rouge, for appellants.
Louis G. Baine, Jr., of Seale, Smith, Baine & Phelps, Baton Rouge, for appellees.
Before LANDRY, ELLIS and BLANCHE, JJ.
BLANCHE, Judge.
This is an appeal by plaintiffs, John L. Slack and his wife, Regina Slack, from a judgment dismissing their malpractice suit against Dr. A. K. Fleet and his liability insurer, The St. Paul Fire and Marine Insurance Company. For the reasons set forth herein, we affirm the judgment in favor of defendants.
The record shows that Mrs. Slack consulted Dr. Fleet on Saturday, August 26, 1967, with complaints of pain and cramping in the stomach, nausea, vomiting and nervousness. Following physical examination Dr. Fleet made a diagnosis of acute cholecystitis with liver manifestations, possible gastric ulcer, hypertension and extreme nervousness. Dr. Fleet prescribed six drugs to be taken by the plaintiff; namely, (1) Liquid Estomul, (2) Elixir Donnatal, (3) Elixir Butisol Sodium,[1] (4) Phenaphen with Codeine, (5) Enarax and (6) Probanthine with Phenobarbital. Mrs. Slack commenced taking the drugs and by Monday, August 28, 1967, she testified she experienced dizzy spells and a skin rash. Mrs. Slack testified that she personally telephoned Dr. Fleet, described her symptoms, and was advised by the doctor to continue the medication. Dr. Fleet, conversely, testified that a female other than Mrs. Slack telephoned him on Monday, related the symptoms being experienced by Mrs. Slack, whereupon the doctor advised the caller to instruct Mrs. Slack to discontinue taking all the prescribed drugs and instead drink some baking soda water two to three times that day. Dr. Fleet further testified he advised the caller to see that the patient's condition was reported to him within the next day or two. Mrs. Slack testified her symptoms persisted and on Wednesday, August 30, 1967, she had her daughter call Dr. Fleet. Plaintiff's daughter, Carol Bennett, testified she called Dr. Fleet, related to him that the rash was more severe and was spreading over her mother's body, whereupon she testified Dr. Fleet asked her to call out the prescription numbers and the drug store where they were filled, and upon her complying with this alleged request, she testified Dr. Fleet ordered that Mrs. Slack discontinue use of only one of the prescribed drugs. Dr. Fleet, on the contrary, testified that an unidentified female caller other than his patient telephoned him on August 30, 1967, advising him of the continuation of the rash, whereupon he inquired whether Mrs. Slack had stopped taking the prescribed drugs, to which inquiry he received an affirmative *652 answer. Dr. Fleet testified at this point he prescribed two antihistamines for the reported skin rash. Mrs. Slack and her daughter testified that because of the persistence of the condition, the daughter again called Dr. Fleet on Sunday, September 3, 1967, as a result of which telephone call Dr. Fleet agreed to and did, in fact, see Mrs. Slack at his office. Dr. Fleet testified that he received the third telephone call from an unidentified female other than Mrs. Slack on Saturday, September 2, 1967, advising him that the rash had spread, whereupon he informed the caller to have Mrs. Slack come to his office that afternoon or Sunday. Dr. Fleet testified he examined the patient on Sunday, September 3, 1967, at his office, and as a result of this examination he arranged for Mrs. Slack to be examined and treated by Dr. Henry W. Jolly, Jr., a Baton Rouge dermatologist.
The trial court summarized the expert testimony offered in the case and gave its reasons for dismissing the suit as follows:
"No medical testimony was offered by the plaintiff, Regina Slack, which is understandable and is true in most malpractice suits because of the reluctance of the medical profession to acknowledge errors of their fellows. Nonetheless, the absence of any affirmative proof on this point must be noted because it contrasts with the supporting testimony furnished by the defendant in affirmation of the treatment rendered by him in the case. Dr. Bruce Baer, an outstanding specialist in internal medicine in the City of Baton Rouge, stated that the diagnosis and treatment furnished by Dr. Fleet was within the standard of care required for a general practitioner to treat these complaints. He further stated the medications prescribed by the doctor are commonly used by practicing physicians in the community and it would be reasonable to prescribe these for the patient's complaints. While he said he may not have prescribed all of the same medicines in an identical case, he could not fault Dr. Fleet for prescribing the five medicines at the same time. In conclusion, Dr. Baer said his common practice was to inquire regarding the patient's sensitivity prior to treatment, but aside from this precaution, neither he nor any other physician administers any test to determine whether a patient was in fact sensitive to such drugs.
"Dr. Vance Byars testified on behalf of the defendant. He said Dr. Fleet's diagnosis and treatment were the same as he would have made under the circumstances. He stated emphatically that there was no fault with the program of treatment prescribed by Dr. Fleet in this case.
"Despite the plaintiff's disagreement with the `locality rule,' the law relative to this case is well established in the Louisiana jurisprudence. As stated by the Supreme Court in the leading case of Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1954):
`A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment in the application of his skill to the case.'
"The medical evidence presented in this case reflects no deviation or departure by the treating physician in his initial treatment from the standard of care followed by other physicians in the community under the circumstances described. The only other question involves a question of proof as to whether Dr. Fleet failed to discontinue the use of the medicines after their apparent adverse effect on his patient had been *653 brought to his attention. The plaintiff and her daughter testified that the doctor only recommended discontinuing the use of one drug, whereas his testimony was directly in opposition. On this point the Court is of the opinion that the greater weight should be accorded to the recorded history of treatment evidenced by the doctor's medical records.
"Plaintiff's counsel in a superb brief makes out a good theoretical case for malpractice by the doctor, but the evidence fails to show that he has carried the burden of proof required in order that the plaintiffs should prevail." (Reasons for Judgment, Record, pp. 54-56)
Counsel for plaintiffs contends that the trial court erred in applying the so-called "locality rule" and in not holding that Dr. Fleet was negligent in prescribing the six drugs to be taken simultaneously by the plaintiff when each of the drugs had a potential side effect of skin rash. In support of this argument, counsel for plaintiffs contends that Dr. Fleet was negligent in failing to conduct tests to ascertain if this patient could take the prescribed combination of drugs.
An examination of the record fails to support these contentions. Dr. Bruce Baer, accepted by the Court as an expert in the field of internal medicine with sub-specialty in gastroenterology, testified that all of the drugs prescribed by Dr. Fleet are commonly used for treatment of the symptoms and findings encountered in this case:
"Q Now, Doctor, will you please tell the Court in your own words what your opinion is with reference to Dr. Fleet's prescribing the medications which he prescribed for this patient under the circumstances and based on your own knowledge and based on the background and research which you have conducted into this matter?
"A Dr. Fleet saw and examined this patient, didn't find any evidence of a surgical condition and, accordingly, elected to treat the patient, placed the patient under a medical theraputic [sic] program and, accordingly, he prescribed these drugs which are in his record and in an effort to give her symptomatic relief of her pain and her disability. These drugs are all commonly used by the medical profession today and certainly no thought of prior skin testing is performed by physicians under conditions such as this.
"BY THE COURT:
"Q Let me ask you this, Doctor: Not whether you yourself would necessarily use these drugs, but for the condition exhibited or complaints made, but as to whether you feel that the prescription of these drugs under the circumstances was reasonable?
"A I feel that it was reasonable to offer this patient symptomatic relief of her complaints.
"BY MR. BAINE:
"Q And, Doctor, without regard to what you would personally which one if any or all or some or maybe other medications which you would have offered in your sub-specialty under the specialty, is therewould it be reasonable for a general practitioner such as Dr. Fleet here, to elect to use these as drugs of choice in the treatment of this patient?
"A I think I would like to reiterate although I might myself not use exactly all these drugs, I think it represents a conscientious and enthusiastic effort to rid her of her symptoms.
"Q Would it be in keeping with the standards of care of the medical profession here in Baton Rouge to so prescribe these medications?
"A Yes, I believe it would be, sir.
"Q Would you think that a doctor prescribing these would be using reasonable *654 care and judgment in the application of his skills?
"A Yes, sir.
"Q Would you think a doctor doing so would be using his best judgment or do you have any opinion that he would be doing anything other than using his best judgment in prescribing these drugs?
"A I think that as a general practitioner he was using his best judgment in prescribing these medications * * *.
"Q Now, Doctor, I want to ask you this final question, my final question: Do you have any opinion as to whether or not Dr. A. K. Fleet in the attendance of this patient has complied with the standards of care that exist within the medical community here in the Baton Rouge area in the attendance of this patient?
"A My answer to that is, yes, I believe he has complied. He has examined the patient, reached a tentative diagnosis and he has prescribed well-known frequently used medications for treatment of same." (Record, pp. 79-82)
Dr. Vance G. Byars, Jr., a Baton Rouge general practitioner, likewise testified that on the basis of his review of Dr. Fleet's medical records and the symptoms and findings, he felt the prescribing of the six drugs was acceptable medical practice:
"Q Doctor, in summary, do you find find any deviation from what you consider the standards of care in this medical community comprised of the Baton Rouge area among the general practitioners of Dr. A. K. Fleet's diagnosis, treatment and entire handling of this patient from the time he first saw her until the time he referred her to Dr. Jolly?
"A I have gone over this very thoroughly because I wanted to be absolutely fair with Dr. Fleet and with anyone else involved were I asked this question. And I want toI willI must say that I think that his care was not only as good as the average, but better than the average. I think this is so. I can find no real fault with the use of the drugs of his program.
"Q Doctor, do you feel that he exercised at least reasonable care and judgment in the attendance of this patient?
"A Yes, I do.
"Q Do you feel that he exercised his best judgment in the application of these prerequisite skills in applying the standards of care here in this medical community?
"A Let me put it this way: He exercised as good a judgment as I would have been able to. I think thatI am egoist enough to think that my judgment would have been good and I think that his is exactly the same as mine would have been.
"Q And anyone of a hundred general practitioners could have seen one of tens of thousands of patients and treated that patient just as exactly as this doctor treated this patient?
"A I would imagine that there have probably been thousands within the last few weeks that have, yes, sir, it is a pretty common program." (Record, pp. 105, 106)
Plaintiff's contention that the prescribing of six drugs to be taken simultaneously by the plaintiff when each of these drugs had a potential side effect was excessive and, as a matter of common sense, amounted to negligence is not supported by the evidence. In the first place, Dr. Byars testified that the doses were not excessive:
"Q Doctor, is there anything here on these drugs, medications, that were prescribed by Dr. Fleet for this *655 patient to indicate that an unusual or excessive amount of any of the drugs, whether it was the Estomul or the Donnatal or the barbiturates in them or the Phenobarbital or anything[,] is there anything to indicate that an excessive or unusual or uncommon amount was received in the total dosages of all these drugs by this patient?
"A No, sir, I would say that this was lower doses than I frequently prescribe when I have a very ill patient. Enarax, I am assuming that that was a five milligram dose. They make that also in a ten milligram and I have given that as often as four times a day. Phenaphen with Codeine is a very common preparation. It is made by A. H. Robins and Company, it comes in a capsule. I am not sure of the exact ingredients, but I believe it contains Phenacetin, Acedophenomen, Aspirin, in addition to the Codeine and probably contains a low dose of a barbiturate. Every one of those could trigger off the reaction but they are very mild doses and that is a drug that is commonly used in the United States." (Record, p. 104)
The contention that increasing the dosage of a drug to which a patient was hypersensitive would increase the chances of a reaction was commented on by Dr. Baer as follows:
"Q Now, if one medicine is contraindicated because there may be a small chance of any adverse reaction and another one has the same contraindication from the same barbiturate, then the chances are doubled, of course, you have one and one?
"A Well, I believe what you are referring to is if a patient is allergic to a barbiturate regardless of what preparation that barbiturate is in they are going to be allergic to it.
"Q That's correct and if you take three or more with such barbiturates you are taking them concentrated because the base is being triplicated, the chances?
"Q[A] You are taking an increased amount of the drug, but it is not necessarily increasing your chances. If you are hypersensitive to it you are going to be hypersensitive to a small amount * * *." (Record, pp. 84, 85)
Both of these physicians testified as to and explained the impracticality of testing for possible drug reaction in advance of prescribing drugs in treatment. Both stated that the doctor must rely on the history given by the patient as to whether the patient is allergic to any drugs, in particular medications which are to be taken orally, and it is not economically feasible to test all patients for possible adverse drug reactions, inasmuch as this would either require the physician to stock the appropriate testing solutions (antigens) and would necessitate his spending the greater part of his working time conducting these tests rather than caring for patients, or would require that the patient be sent to appropriate laboratories or hospitals for such tests, which would result in an unnecessary financial burden.
Dr. Fleet testified he had used this same type treatment on numerous occasions with other patients before this plaintiff and afterwards, with no adverse results. Dr. Fleet likewise testified as to the extreme impracticality of testing patients for possible adverse drug reactions prior to prescribing medications.
Counsel for plaintiffs cites the case of Favalora v. Aetna Casualty and Surety Company, 144 So.2d 544 (La.App.1st Cir. 1962), certiorari denied, for the proposition that a physician cannot avoid liability to a patient on the ground that he followed a custom or procedure of other similar physicians in the community when such practice constitutes negligence in that it *656 fails to meet the test of reasonable care and diligence. In Favalora, while this Court conceded that the legal principles set forth in Meyer v. St. Paul-Mercury Indemnity Company, reproduced above, were applicable in a medical malpractice action, nevertheless, this Court held that a member of the medical profession may not avoid liability to a patient on the ground that the physician followed a custom or procedure of other similar practitioners in the community when such practice is shown to constitute negligence. In reaching this conclusion or elaboration on the Meyer case, this Court pointed out that a physician from the defendant-physician's locality testified that although the procedure followed by the defendant was indeed practiced by other members in the same field in the community, nevertheless, the procedure was recognized by members of the same profession not only as being faulty but also contrary to what members of the profession were taught in medical institutions[2]:
"We believe that conformity with the standard of care observed by other medical authorities in good standing in the same community cannot be availed of as a defense in a malpractice action when the criterion relied upon is shown to constitute negligence in that it fails to guard against injury to the patient from a reasonably foreseeable contingency. In the case at bar it is shown by a member of the profession from defendant's locality that whereas the procedure followed by defendant is indeed practiced by other members in the same field in the community, nevertheless, it is recognized by members of the same profession not only as being faulty but also contrary to what members of the profession have been taught in medical institutions of learning. The soundness of requiring a clinical history of patients scheduled to undergo such extensive radiological examination readily impresses this court considering the many factors which may affect the physical well-being of an individual subjected to the tests plaintiff was required to undergo. * * * It would appear that even a superficial clinical history would be of considerable value to the radiologist and assisting technicians in determining, among other things, the patient's ability to stand without incident during such prolonged examination." (144 So.2d at 550, 551)
The principle enunciated in Favalora avails plaintiffs nothing in the instant case, for the reason that the evidence fails to show where the defendant-physician engaged in a procedure which was of such a deviation from the general standard of care as to constitute negligence. Unlike the situation in Favalora, the record in the instant case contains no evidence that the defendant-physician failed to exercise reasonable care or pursued an unreasonable course of treatment. We are satisfied the trial court committed no manifest error in concluding the defendant-physician was not guilty of negligence either with regard to his prescribed course of treatment or with regard to his not testing plaintiff for possible adverse drug reactions prior to prescribing the medications.
The remaining specifications of error direct themselves to the issues of whether the defendant-physician was negligent in not ordering plaintiff to discontinue the prescribed medication sooner and in not examining plaintiff sooner upon receipt of the complaints. These issues necessarily *657 involve questions of credibility of the witnesses, in view of the discrepancy between the testimony of plaintiff and her daughter on the one hand and that of Dr. Fleet on the other. As previously indicated and as evidenced by the Reasons for Judgment, the trial court resolved these issues of credibility in favor of the defendants. Factual conclusions of the trier of fact, especially those based upon evaluation of credibility of witnesses, will not be disturbed on appeal unless manifestly erroneous, Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707 (1958); Orlando v. Polito, 228 La. 846, 84 So.2d 433 (1955). We find no such manifest error in this regard.
Accepting Dr. Fleet's version of what happened, it is clear that the trial court committed no manifest error in concluding that the defendant-physician was not negligent insofar as ordering the patient to discontinue use of all prescribed medicines, which Dr. Fleet ordered upon receipt of the first complaints of skin rash on Monday, August 28, 1967. Nor do we feel the trial court manifestly erred in concluding that Dr. Fleet was not negligent in not seeing the patient until Sunday, September 3, 1967. Dr. Fleet testified that as soon as he was advised of the skin rash, he ordered all medicine which he had prescribed discontinued. He stated that normally the irritation would subside within a couple of days after termination of use of the drugs. When he was advised that the skin rash was still present on Wednesday, August 30, 1967, he verified that the patient had stopped using the drugs, and then prescribed appropriate antihistamines to counteract the skin rash. When this supportive therapy was unsuccessful and the rash persisted, he advised the patient to come in for examination, and upon examination he referred the patient to a specialist. (Record, p. 128) There being no evidence in the record to indicate a deviation from the appropriate standard of care owed by the defendant-physician to the plaintiff, we find no manifest error committed by the trial court in failing to find the defendant-physician negligent.
The judgment appealed from is, accordingly, affirmed, with all costs assessed to plaintiffs-appellants.
Judgment affirmed.
NOTES
[1] Drugs (1)-(3) were combined in one prescription.
[2] The pivotal issue in Favalora was whether a radiologist was required to obtain a clinical history from the patient before conducting extensive radiology tests; plaintiff in that case was subjected to extensive radiology tests necessitating her standing for extensive periods of time, despite the fact that clinical history would have revealed she had been experiencing fainting spells. During the radiology diagnostic work, plaintiff fainted and fell, sustaining severe personal injuries. This Court held that the failure of the radiologist to obtain a clinical history under these circumstances constituted negligence.