169 So.2d 687 (1964)
Eris R. OSBURN et al.
v.
I. H. SALTZ.
No. 5623.
Court of Appeal of Louisiana, First Circuit.
November 16, 1964.
Rehearing Denied December 21, 1964.
*688 Farrell A. Blanchard, Donaldsonville, for appellants.
Sessions, Fishman, Rosenson & Snellings, New Orleans, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This is a medical malpractice action wherein plaintiffs, Eris R. and Alice Osburn (husband and wife), seek damages from defendant, Dr. I. H. Saltz, for alleged negligent performance by defendant of a hysterectomy upon Mrs. Osburn and failure to accord his said patient proper post-operative care. Plaintiffs maintain defendant's reputed professional carelessness resulted in complications causing his said patient considerable pain, discomfort, inconvenience and loss of earnings and necessitated the incurrence of medical expense by plaintiff husband in the treatment thereof. The learned trial court concluded plaintiffs failed to establish their allegations of negligence by a preponderance of evidence and to that degree of certainty required by law and rejected petitioners' demands, hence this appeal.
Viewed in its entirety, plaintiffs' petition specifically charges defendant negligently punctured Mrs. Osburn's bladder during the course of the aforementioned surgical procedure and thereafter left her virtually unattended in Lakewood Hospital, Morgan City, Louisiana, as a consequence of which the abdominal incision made in the course of the operation became infected and eventually turned gangrenous. It is further contended the post-operative complication seriously endangered plaintiff's life, necessitated additional surgery and has caused permanent, irreparable damage to her nervous system.
It is conceded defendant, assisted by Dr. S. J. Russo, performed a hysterectomy on plaintiff on October 29, 1957, and approximately seven days thereafter plaintiff began developing complications which subsequently led to her removal from the hospital in Morgan City to Touro Infirmary, New Orleans, Louisiana, to which latter institution she was taken by ambulance November 7, 1957. It is further acknowledged plaintiff's post-operative condition was eventually diagnosed as a vesicovaginal fistula which in lay terminology means a connection between the bladder and vagina. In this regard the record reflects the condition ultimately found means there was an abnormal hole, puncture, or rupture of plaintiff's bladder with resulting leakage of urine therefrom and the passage of such excretion through an unnatural channel into the vagina instead of normally through the urethra.
The salient feature of this case is whether the puncture of plaintiff's bladder occurred during the operation or subsequently due to infection caused by defendant's alleged negligent post-operative care of the patient (as contended by appellants) or whether it occurred by infection which resulted notwithstanding defendant's care and treatment of plaintiff following the operation and due to circumstances beyond appellee's control as contended by defendant.
It now appears learned counsel for appellants has abandoned the contention that *689 defendant negligently caused the injury during the course of the operation. In the specification of errors contained in his brief filed before this Court esteemed counsel for plaintiffs charges the trial court with error in the following respects only:

"ERRORS OF THE TRIAL COURT:
"We believe that the Trial Court was overly impressed by the testimony of the several Doctors who testified on behalf of the defendant to the effect that they had examined the record in the case and were of the opinion that defendant had acted according to the standard prevailing in the community, and in a manner in which they would have acted in similar circumstances, to the extent that he overlooked the fact that the defendant, neither by his testimony, nor by anything in the hospital record, ever explained or justified or justified (sic) his lack of care and negligence in permitting the plaintiff Alice Osburn to steadily deterioate (sic) and become grossly infected in and around her surgical wound to such a degree that gangrene was prevelent (sic) and manifest before he ever discovered it. That the Trial Court should have found for plaintiffs and granted them judgment as prayed for."
Assuming arguendo, the issue of defendant's alleged negligence during the course of the operation is before us on this appeal, it suffices to say the record is devoid of evidence to establish defendant's asserted carelessness in this regard. In detailed testimony, defendant (and the physician who assisted him in performing the surgery in question) explained each step of the operative process and the care and precautions taken to avoid injury or damage to organs adjacent to those portions of plaintiff's anatomy removed in the operation. It appears from their testimony that if the bladder had been unintentionally punctured in the course of the operation, such circumstance would have immediately been known and corrective steps taken to repair the damage before the operation would have been allowed to proceed to its conclusion. By an overwhelming preponderance of medical testimony (which it is unnecessary to detail herein), it further appears if such a mishap should have occurred and gone undetected by the operating team, plaintiff would have exhibited certain unmistakable symptoms within a minimum of approximately 24 hours and a maximum of 72 hours following the operation and no such symptoms were shown by plaintiff until well after this crucial period.
Our careful consideration of the briefs filed herein and the voluminous record compiled on the trial of this matter reveals that, except as hereinafter otherwise noted, the events and circumstances giving rise to this litigation are virtually without dispute. The chief contention between the parties appears to concern the applicable rules of law with respect to the burden of proof in medical malpractice actions.
In September, 1957, Dr. Saltz recommended a complete hysterectomy for Mrs. Osburn predicated upon an examination and laboratory report which indicated she was suffering from a non-malignant, pre-cancerous condition of the cervix. The patient was admitted to Lakewood Hospital October 28, 1957, where the surgery was performed the following day by defendant with the assistance of a colleague, Dr. S. J. Russo.
Upon incising the patient's lower abdominal cavity and exposing to view the organs adjacent to the part of plaintiff's anatomy to be removed in the operation, it was immediately noted Mrs. Osburn had massive adhesions to the extent she was deemed to have a 90% "frozen pelvis". According to the expert testimony of record, adhesions are banks of abnormal fibrous types of tissues between bodily organs resulting from either inflammation, disease or prior surgery. In plaintiff's case it is not clear from the record whether the adhesions noted resulted from prior infection or previous surgery (it being conceded *690 she had previously undergone surgery for a female complaint). By accepted medical technique, the adhesions encountered were separated, the various organs freed of their abnormal connecting fibrous masses, removal of the affected organs was accomplished, the necessary closures were made and the incision in plaintiff's lower abdomen was sutured and surgically dressed thus completing the entire operative process.
On the third day following the operation, November 1, 1957, Mrs. Osburn commenced exhibiting symptoms of ileous which in lay parlance means intestinal obstruction or paralysis. It is shown that ileus is not an unusual or unexpected development in cases involving abdominal surgery but, on the contrary, is a rather common occurrence in such instances.
The hospital chart (which admittedly was not complete due to the lack of medical secretaries at the hospital) indicates plaintiff's condition was treated by the insertion of certain nasal and rectal drainage tubes, the administration of sedation and drugs to inhibit vomiting, and an infusion. On November 4, 1957, plaintiff became restless, irrational and refused sedation which indicated to defendant she was experiencing an electrolytic imbalance or was in the early stages of post-surgical psychosis. The infusion ordered by appellee was intended to prevent electrolytic imbalance. At this time plaintiff complained of a mild sore throat which was attributed to irritation from the nasal tube. To ease her discomfort in this respect, defendant prescribed antibiotic lozenges.
On November 5, 1957, plaintiff developed a vaginal odor which was treated by the insertion of sulfathiazole suppositories. According to defendant, the odor was not particularly strong and was eliminated by the treatment prescribed. On this issue, however, defendant is stoutly contradicted by lay witnesses (relatives of appellant who visited her during her convalescence) who variously described the odor as "very strong", "foul", putrid", and likened it to the smell of "rotten meat."
On November 6, the patient became more restless and exhibited further symptoms of post-surgical psychosis in that her periods of irrationality increased. At this juncture all tubes were removed. The following day, November 7, 1957, Mrs. Osburn became even more restless and irrational. Dr. Saltz personally removed the sutures from the surgical wound and thereupon noted a dark drainage from the incision. At this time he also noted a dark drainage from the vagina. On defendant's orders the incision was dressed and a catheter inserted into the patient's bladder. The patient's condition worsened and that afternoon a visit by Dr. Saltz disclosed the presence of an infection and symptoms which led him to suspect the possibility of an electrolytic imbalance, a fecal fistula or a vesico-vaginal fistula. Considering the condition of his patient to be alarmingly serious (but not necessarily terminal) defendant called in consultation Dr. Russo and consulted by telephone with Dr. I. W. Kaplan of New Orleans, a surgeon. Upon explaining the history and condition of the patient to Dr. Kaplan, it was agreed plaintiff's condition was such that she needed treatment not available at Lakewood Hospital, namely, laboratory facilities to determine the patient's degree of electrolytic imbalance and identify the particular organism responsible for the infection in order that a particular antibiotic might be prescribed to combat the contagion instead of general spectrum antibiotics which is all Dr. Saltz could prescribe without knowledge of the precise bacillus present. Following the aforesaid consultations plaintiff was taken to Touro Infirmary, New Orleans, Louisiana, where she was attended by Dr. Kaplan who, upon examination, found the surgical incision to be infected. Dr. Kaplan debrided the wound which consists of removing the dead or infected tissue which impedes the healing process. He also administered antibiotics and increased drainage of the incision by insertion of a tube. Laboratory analysis *691 disclosed the patient to be suffering from moderate electrolytic imbalance which was corrected by the intravenous administration of appropriate fluids. Dr. Kaplan also noted the presence of a vesico-vaginal fistula with accompanying vaginal infection. Specific antibiotics were then prescribed in treatment of the infected incision as well as the vaginal-urinary infection. Approximately one week later plaintiff was discharged muchly improved but with an indwelling catheter to keep the bladder empty thereby promoting natural healing of the vesico-vaginal fistula. The catheter necessitated frequent lavages which consist of mechanical methods of attempting to sterilize the affected field to prevent, contain and reduce infection by introduction of strong fluids which produce a highly irritating, discomforting and painful burning sensation. Plaintiff remained at home in this condition until December, 1957, when, upon removal of the catheter, it was discovered the fistula had not healed naturally inasmuch as plaintiff continuously thereafter seeped urine with all the accompanying discomforts and embarrassments attending such an unfortunate condition which, however, it is unnecessary to narrate in detail herein.
Subsequently, in April, 1958, Mrs. Osburn was hospitalized in Southern Baptist Hospital, New Orleans, where she was operated on by Dr. Conrad Collier for repair of the fistula. The operation proved successful and relieved appellant of the disagreeable and intolerable conditions she previously endured.
Unfortunately, however, as a result of the residual weakening of the abdominal tissues caused by the infection of the hysterectomy incision, Mrs. Osburn later developed a ventral hernia which was reduced by a third operation performed in September, 1958, by Dr. Kaplan.
It is well settled that in a malpractice suit it is incumbent upon a physician to show he is possessed of the required skill and competence and in applying same he used reasonable care along with his best judgment. The applicable rule, long followed in this state, is put as follows in Meyer v. St. Paul-Mercury Indemnity Co. of St. Paul, Minn. et al., 225 La. 618, 73 So.2d 781, on rehearing at page 786:
"The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment. The rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur which places the burden on a defendant having control of the dangerous instrumentality which caused an accident to show his freedom from negligence in a case where such accident would not ordinarily have occurred had proper care and use been made of the instrumentality. As stated by the Court of Appeal in its opinion in this case, however, that does not mean that the defendant must show just what was the cause of the occurrence."
Regarding the degree of care and skill exacted of a physician or surgeon in the treatment of his patients the following pronouncement appearing in Meyer v. St. Paul-Mercury Indemnity Co., supra, at page 782, Volume 73 So.2d, is apropos the case at bar.
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, *692 31 So. 303; Roark v. Peters, 162 La. 111, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La.App., 19 So.2d 901; Wells v. McGehee, La.App., 39 So.2d 196. See also 70 C.J.S., Physicians and Surgeons, § 41."
Adverting to appellants' contentions in the light of the foregoing applicable jurisprudence, as previously shown, it appears the vesico-vaginal fistula suffered by Mrs. Osburn did not result from negligence of defendant during the operation. We can only conclude, therefore, the fistula resulted from infection which poses the question whether the infection resulted from the negligence of Dr. Saltz in performing the operation or his failure to take adequate post-operative care of his patient.
The evidence clearly reflects the procedure followed by defendant with respect to preparation of the patient for surgery followed acceptable, approved techniques employed by his colleagues in the community. The field of operation was sterilized in accordance with standard procedure and all ordinary and orthodox precautions were taken both during and after surgery. It further appears that the organism found to be the cause of plaintiff's infection was one normally found in the colon and its introduction into the genito-urinary system could have occurred when appellant's abdomen was surgically opened. Moreover, it appears that during plaintiff's convalescence she was administered baths by visiting relatives without the knowledge, consent or approval of defendant. It is suggested by defendant and the experts called to testify on his behalf, the infection could have been caused by these well intentioned but unauthorized ablutions.
Plaintiffs' chief contention is to the effect the infection of the incision and consequent complications resulted from lack of proper post-operative care on the part of defendant. Through the testimony of lay witnesses plaintiffs attempted to establish that defendant did not visit the patient regularly, did not examine the incision, ignored their complaints of the foul odor emanating from the patient and disregarded their representations of the patient's distress and discomfort. More precisely, it is contended defendant permitted the incision to become infected to the extent Dr. Kaplan found it necessary to debride the wound. Appellants further maintain defendant failed to administer broad spectrum antibiotics following the operation to prevent post-operative infection.
The record convinces us defendant has discharged the burden incumbent upon him to show he possessed the requisite skill and competence in performing the operation in question and caring for his patient thereafter and in the exercise thereof used reasonable care and diligence along with his best judgment.
Defendant called as expert witnesses in his behalf Drs. S. J. Russo and Mario Lopez of Morgan City and Dr. J. M. Fernandez, formerly of Morgan City but a practitioner in Franklin, Louisiana, at the time of trial. Each said expert witness testified regarding the standards of practice in Lakewood Hospital in similar cases. After examining plaintiff's hospital record, defendant's medical experts were unanimous in the opinion defendant had exercised the degree of skill and followed approved techniques and procedures ordinarily employed under similar circumstances by physicians in good standing in the community. They were likewise one in the opinion the procedure used by defendant was the same they would have followed and usually did employ in the handing of their own patients. Neither of said experts took exception or in any manner disagreed with any part of the treatment administered by defendant.
Defendant testified in essence the techniques employed in post-operative treatment were standard and designed to alleviate every known, anticipated or suspected complication following surgery. He inserted *693 tubes to relieve ileus (which is to be expected following abdominal surgery). He also prescribed sedatives to ease plaintiff's pain and calm her nerves. In addition he prescribed infusions to guard against electrolytic imbalance although the hospital possessed no laboratory equipment to measure or determine degree of electrolytic imbalance. To guard against infection he prescribed broad spectrum antibiotics. His testimony is to the effect he visited plaintiff in her hospital room twice daily and in this regard he is corroborated by the hospital records. According to defendant when he examined the patient, and when he removed the sutures, he permitted no one in the room except the nurse.
Mr. Osburn testified he was present on several occasions when defendant visited Mrs. Osburn in the hospital after surgery. While said plaintiff does not claim to have been present on every visit by defendant, nevertheless he maintains that at no time did he observe defendant examine the patient.
The medical evidence of record herein is overwhelmingly to the effect that in a relatively small percentage of such cases (variously estimated between one and three percent) infection does occur irrespective of the skill of the surgeon or the care tendered the patient. The record is barren of any suggestion regarding what, if anything, defendant could or should have done, which he did not do, to prevent the unfortunate complications experienced by appellant.
Favalora v. Aetna Casualty & Surety Company, La.App., 144 So.2d 544, heavily relied upon by esteemed counsel for appellants is without application to the case at bar.
In the cited case it appeared that defendant failed to take proper precaution against a contingency reasonably to be expected under the attending circumstances. Moreover, the decision in the Favalora case, supra, turns on the point that the accepted procedure of depending upon the personal agility of the radiologist and/or his assistant to catch a patient who might faint during the examination involved was negligence per se. The essential elements constituting the basis for the rule in Favalora, supra, are totally lacking in the case at bar.
Accordingly, the judgment of the trial court is affirmed at appellants' costs.
Affirmed.