304 So.2d 686 (1974)
Margaret BELL
v.
Henry B. FARIS, M.D., et al.
No. 6443.
Court of Appeal of Louisiana, Fourth Circuit.
December 10, 1974.
Uddo & Gertler, M. H. Gertler, New Orleans, for plaintiff-appellant.
*687 Lemle, Kelleher, Kohlmeyer & Matthews, William S. Penick, New Orleans, for defendants-appellees.
Before STOULIG, MORIAL and BOURG, JJ.
MORIAL, Judge.
Plaintiff, Margaret Bell, daughter of decedent, Louise Baker, filed suit against Dr. Henry B. Faris and his insurer, St. Paul Fire & Marine Insurance Company, Prayer Tower Rest Home, Pan American Life Insurance Company and Charity Hospital of Louisiana.
The district court dismissed plaintiff's suit. She appeals formally against all defendants, but her brief is directed exclusively to the dismissal of her suit against Dr. Faris. We affirm the district court's finding that the care and treatment rendered by Dr. Faris did not constitute malpractice.
Plaintiff and her mother, a 75 year old medicare beneficiary, lived together. Plaintiff, though deaf, could talk and read. Plaintiff's full time employment caused her to leave her mother at home alone during the day.
Decedent's medical history as evidenced by the records of Charity Hospital dated back to 1935 when she was treated for syphilis. She entered Charity Hospital in February 1966 with erysipelas, cellulitis, elephantiasis, and chronic stasis dermatitis (from poor circulation) of both legs. At that time it was noted that she could not bend her knees and could not walk and screamed because of the severe pain in her legs and hips. Upon her discharge from Charity Hospital she was treated on an outpatient basis during June-August 1966. Records from that period show that she had "leutic (i. e., syphilitic) involvement of spinal cord." She was evaluated orthopedically and intensive physical therapy was recommended. Her knees remained locked and her legs useless and painful.
Dr. Faris began seeing Mrs. Baker in her home in February of 1968 and saw her on a regular basis to December 26, 1969. Mrs. Baker was admitted into Charity Hospital through its emergency room on January 1, 1970. At the time of her admission to Charity Hospital her condition was diagnosed as follows: (a) statis dermatitis, cellulitis and severe infection due to gangrene of both feet and legs which were swollen and inflamed (b) dehydration (c) severe bedsores and ulcers on the body especially on the buttocks (d) pneumonia (e) infected urine (f) peripheral vascular disease (arteriosclerosis) (g) infiltrate in lungs (h) severe mental anxiety and distress (i) other related and associated problems and discomfort. At that time she underwent immediate bilateral amputations for the gangrene of both legs. She was thereafter taken to Provident Nursing Home and then to Prayer Tower Rest Home where she died on March 13, 1970.
Plaintiff correctly argues that a physician has a duty to exercise the degree of skill ordinarily employed under similar circumstances by members in his profession in good standing in the same community or locality; that a physician must use reasonable care and diligence along with his best judgment in the application of his skill in each particular case. It is their firm contention that Dr. Faris did not diagnose Mrs. Baker as having peripheral vascular disease. Plaintiff contends that had Dr. Faris treated decedent for such, the gangrene settling into her legs and the amputations that resulted would have been avoided. Plaintiff contends that Dr. Faris was negligent in that he failed to examine Mrs. Baker for illness other than arthritis.
Defendant contends that the evidence shows abundantly that he was not negligent in the procedures employed and that he did treat Mrs. Baker for peripheral vascular disease, i. e., arteriosclerosis. Secondly, defendant argues that no doctor who testified found fault with the treatment given by Dr. Faris and that plaintiff's *688 expert witness, Dr. David Dombeck, (who testified by deposition) could not state that the treatment given by Dr. Faris varied so greatly from that standard of practice of local physicians as to be negligent. Defendant further contends that Dr. Faris warned and advised Mrs. Baker on numerous visits that she must go into a hospital and then into a nursing home where she could have constant and continued twenty-four hours a day care. This advice was not followed by decedent from the time Dr. Faris started seeing her until his last visit on December 26, 1969. Lastly, defendant argues that decedent developed gangrene some days after Dr. Faris last saw her.
The sole question presented is whether Dr. Faris' diagnosis and treatment of Mrs. Baker was so deficient as to fall below the legal standard. The well established rule of law relating to a physician's duty to his patient is stated in Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954) at page 782.
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. * * *"
See also Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966); and Bryant v. St. Paul Fire and Marine Insurance Co., 272 So.2d 448 (La.App. 2d Cir. 1973).
In a medical malpractice suit it is incumbent upon the physician to show he is possessed of the required skill and competence and in applying same he exercised reasonable care along with his best judgment. See Foster v. St. Paul Fire and Marine Insurance Co., 212 So.2d 729 (La. App. 4th Cir. 1968); and Osburn v. Saltz, 169 So.2d 687 (La.App. 1st Cir. 1964). Accordingly, we must question whether or not Dr. Faris proved that his medical conduct was within the standard as set forth in our jurisprudence. A thorough and careful reading of the record convinces us that Dr. Faris met that standard.
Plaintiff called Dr. Faris under the act. He testified that he first saw Mrs. Baker in February of 1968 when she complained only of pain in her back and knees. At that time he took her medical history, but knew some of the history since he had treated her occasionally before. Dr. Faris noted an ulcer on the anterior of her left leg for which she was being treated at Charity Hospital. He told her to continue the same medication (A & D Ointment) prescribed by Charity Hospital for the ulcer since he would have recommended that medication. On this visit Dr. Faris cautioned her about staying at home alone and recommended that she have twenty-four hour care. Dr. Faris testified that over a period of time from February 1968 until December of 1969 the ulcer on her leg gradually decreased in size to a point around the size of a quarter dollar. Dr. Faris testified that Mrs. Baker first complained to him about the ulcer in November 1968 at which time it was treated with silver nitrate. According to Dr. Faris' notes the ulcer continued to improve until November 6, 1969 when plaintiff called him and told him that she had been bitten by roaches. At this time Dr. Faris prescribed penicillin for blisters around the ulcer which to him indicated a moderate infection.
Defendant's medical notes of his treatment of Mrs. Baker which were admitted into evidence are replete with instances when decedent was told that it was necessary for her to be admitted into the hospital where she could receive constant care and treatment. His medical notes evidence the fact that at times Mrs. Baker told Dr. Faris that she received no help from the plaintiff.
*689 Dr. Faris testified that on December 26, 1969 (his last visit) Mrs. Baker complained of severe pain in her back. She was bent over to one side and couldn't straighten out. He stated at that time that her legs did not look bad and there was no foul odor or smell. There was some discoloration from a mild infection surrounding the ulcer.[1] Her voice was strong but she was unable to move about. He again insisted that she go to the hospital. It is his testimony that the plaintiff was to come home two or three hours later and take her mother to the hospital. Dr. Faris went to the Baker home on the morning of December 27, knocked on the door and got no response. He therefore, assumed that Mrs. Baker had been taken to the hospital.
Two doctors testified for the defendant: Dr. J. Brown LaRose, a specialist in family medical practice and a professor at LSU Medical School, and Dr. Lawrence P. O'Meallie, an internist and cardiologist.
A hypothetical medical condition comparable to that of Mrs. Baker's was posed to Dr. LaRose. He replied that, given a patient as described, in his opinion, Dr. Faris complied with the medical standards of the community. Dr. LaRose testified that Dr. Faris' treatment went far beyond what the average doctor of his age and generation or younger would have done. In Dr. LaRose's opinion the gangrene which necessitated the amputation of both legs could have set in in a period of from two to three days in a patient with the medical condition of Mrs. Baker. When questioned by the plaintiff about the sophisticated methods of examination referred to in the testimony of Dr. Dombeck, Dr. LaRose opined that such methods could only be used in a hospital. He further agreed with the opinion of Dr. Faris that vaso dialators would not be of significant help in the arteriosclerosis of Mrs. Baker. Dr. O'Meallie also agreed that gangrene could set in within days in a patient such as Mrs. Baker. He further agreed with the treatment given by Dr. Faris as to the blisters around the ulcer which he thought would respond well to penicillin, the drug prescribed by Dr. Faris. He too agreed, when presented with a hypothetical medical condition similar to that of Mrs. Baker, that the conduct of Dr. Faris was within the degree of skill of medical practitioners within the community.
Plaintiff testified that she took care of her mother for many years but relied on her mother's request as to when it would be necessary for her to go to the hospital. She bathed her mother on December 30 and confirmed that the blisters on the front of Mrs. Baker's body, on her thigh, and on her breast were not present. It is her testimony that she first noticed those blisters on New Year's Eve. On the following day her mother was not talking and she then panicked and thought that her mother should be taken to the hospital.
Considering plaintiff's contentions in view of the foregoing applicable jurisprudence, it appears clearly that the amputations of Mrs. Baker's legs nor her death resulted from the negligence of the defendant. Plaintiff has failed to prove her case. A physician is not an insurer of the results of treatment afforded a patient. Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35 (1963).
The record convinces us Dr. Faris discharged the burden incumbent upon him to show he possessed and exercised the skill ordinarily employed, under similar circumstances by the general practitioners in the community and that he utilized medical skill and competence in the diagnosis and treatment of his patient. He used reasonable care and diligence along with his best judgment.
For the foregoing reasons the judgment of the district court is affirmed at plaintiff's costs.
Affirmed.
NOTES
[1] We note here that Mrs. Daisy Winslow testified that Mrs. Baker had some discoloration in her lower legs since 1966 when she was in Charity Hospital for a dermatology problem.