350 So.2d 205 (1977)
Dorothy Hebert ARDOIN, Michelle Ardoin, Renee Ardoin, Lorrie D. Ardoin, Jr., Gerald W. Ardoin, Larry M. Ardoin, Kenneth J. Ardoin, Karen Ardoin, Loraine Ardoin, and Denise Ardoin, Plaintiffs-Appellees,
v.
HARTFORD ACCIDENT & INDEMNITY CO., et al. (Darrell Gregory, Our Lady of Lourdes Hospital, Inc., and Hartford Accident & Indemnity Co., (as insurer), Travis Bohannon, Gulf Insurance Co., and Bentley Laboratories, Inc. and American Home Assurance Co.), Defendants-Appellants.
No. 6096.
Court of Appeal of Louisiana, Third Circuit.
August 30, 1977.
As Amended On Denial of Rehearings October 11, 1977.
Writ Refused in Part and Granted in Part December 5, 1977.
*207 Welton P. Mouton, Jr., Lafayette, for defendant-appellant, Our Lady of Lourdes Hosp., Hartford Acc. & Indem. Co.
Broussard, Broussard & Moresi by Paul G. Moresi, Jr., Abbeville, for plaintiff-appellee.
Lewis & Lewis by James T. Guglielmo, Opelousas, for defendant-appellant, Home Ins. Co.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell by Timothy J. McNamara, Lafayette, for defendant-appellant, Bentley Lab. Inc. and Gulf Ins. Co.
Lynn C. Woods, Jr., Houston, Tex., for defendant-appellant, Travis R. Bohannon.
Voories & Labbe by H. Lee Leonard, Lafayette, for defendant-appellee, James R. Bozeman and Hartford Acc. & Indem. Co.
Richard R. Kennedy, Lafayette, for defendant-appellee.
Charles Boudreaux, Pugh, Boudreaux & Gachassin, Lafayette, for defendant-appellant.
Before CULPEPPER, GUIDRY and FORET, JJ.
GUIDRY, Judge.
Plaintiffs, the surviving spouse and children of the decedent, Lorrie Ardoin, bring this wrongful death action to recover damages for loss of support, love and affection.[1]
*208 The decedent was admitted on July 8, 1975 to Our Lady of Lourdes Hospital in Lafayette, for a coronary artery bypass operation, which he was to undergo the following morning, July 9, 1975. During the operation Mr. Ardoin died of a massive air embolism when the life supporting equipment (which includes a pump and oxygenator), commonly referred to as the heart-lung machine, mistakenly pumped air into his heart. The following parties are made defendants:
(1) Ronald DeBlanc, his insurer, St. Paul Fire and Marine Insurance Company, and Darrell E. Gregory, both pump technicians employed by Our Lady of Lourdes Hospital; and, Travis Bohannon, district manager for Bentley Laboratories, Inc. Plaintiff alleges that the named defendants were negligent in failing to install the sump tubing on the pump in a proper manner; failing to operate said pump in a careful and prudent manner; and, in using for the first time an oxygenator manufactured by Bentley Laboratories, Inc., on a pump made by a different manufacturer, without ascertaining that it was safe to do so and without ascertaining the proper mechanical functions of said pump in regards to this new equipment.
(2) Our Lady of Lourdes Hospital and its insurer, Hartford Accident and Indemnity Company (hereinafter referred to as "Hartford"), as the employer of Ronald DeBlanc and Darrell Gregory, plaintiff additionally alleging independent acts of negligence on the part of the hospital in failing to provide proper supervision and instructions to its employees in the use of the equipment.
(3) Bentley Laboratories, Inc., and its insurers, Gulf Insurance Company (hereinafter referred to as "Gulf") and American Home Assurance Corporation (hereinafter referred to as "American Home"), as the employer of Travis Bohannon, plaintiff again alleging independent acts of negligence in that Bentley Laboratories, Inc. manufactured the oxygenator in question and that said oxygenator was defective in its design and/or manufacture.
(4) Dr. James Bozeman, and his insurer, Hartford, plaintiff alleging he was negligent in failing to check the pump to insure that it was properly rigged; failing to check the sump tubing to determine if it was sucking or pumping; and, failing to clamp off the aorta so that no air pumped into the heart could escape beyond that point and do damage to the patient.
To succinctly summarize, all the named defendants filed answers generally denying the allegations of the plaintiffs' petition and by way of myriad third party and reconventional demands the defendants, Ronald DeBlanc and his insurer, Darrell Gregory, and Our Lady of Lourdes and its insurer seek indemnification and/or contribution against Travis Bohannon and Bentley Laboratories, Inc., and its insurers; and, the defendants, Travis Bohannon and Bentley Laboratories, Inc. and its insurers seek indemnification and/or contribution against Ronald DeBlanc and his insurer, Darrell Gregory and Our Lady of Lourdes, and its insurer, as well as from Dr. James Bozeman and his insurer.
Additionally Ronald DeBlanc, Darrell Gregory, and Our Lady of Lourdes and its insurer Hartford filed a third party claim in redhibition against Travis Bohannon and Bentley Laboratories, Inc., and its insurers, alleging that the oxygenator sold to Our Lady of Lourdes Hospital by Bentley Laboratories, Inc. was defective. After a hearing upon a motion filed by the third party defendants the trial court severed the cumulated redhibitory action. Subsequently, the trial court denied the third party plaintiffs' motion that the severed redhibition action be rejoined in the instant suit.
Following trial the jury returned special verdicts finding that Lorrie Ardoin's death was proximately caused by the joint and concurrent negligence of Darrell Gregory and Travis Bohannon and assessing damages. The jury found no negligence on the *209 part of Ronald DeBlanc; no independent negligence on the part of Our Lady of Lourdes Hospital; and, no negligence on the part of Dr. James Bozeman, nor did it find Bentley Laboratories, Inc. had manufactured and/or designed a defective product. In accord with these findings judgment was rendered and signed as follows:
"IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment rendered herein in favor of plaintiff Dorothy Hebert Ardoin, individually, in the sum of One Hundred Ninety-five Thousand Dollars ($195,000.00); and in favor of Dorothy Hebert Ardoin as natural tutrix of the estate of the minor Michelle Ardoin in the sum of Thirty-five Thousand Dollars ($35,000.00) and in favor of Dorothy Hebert Ardoin as natural tutrix of the minor Renee Ardoin in the sum of Thirty-five Thousand Dollars ($35,000.00); and, as natural tutrix of the estate of Lorrie Ardoin, Jr., in the sum of Fifty Thousand Dollars ($50,000.00); and in favor of the major Gerald W. Ardoin in the sum of Eighteen Thousand Dollars ($18,000.00); and in favor of the major Larry M. Ardoin in the sum of Eighteen Thousand Dollars ($18,000.00); and in favor of the major Kenneth J. Ardoin in the sum of Eighteen Thousand Dollars ($18,000.00); and in favor of the major Karen Ardoin in the sum of Eighteen Thousand Dollars ($18,000.00); and in favor of the major Lorraine (sic) Ardoin in the sum of Eighteen Thousand Dollars ($18,000.00); and in favor of the major Denise Ardoin in the sum of Eighteen Thousand Dollars ($18,000.00).
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the above judgment be rendered in favor of said plaintiffs and against the defendants Darrell E. Gregory and his insurer, Hartford Accident & Indemnity Company, and Travis R. Bohannon and his insurer, American Home Assurance Corporation, jointly and in solido together with legal interest thereon from date of judicial demand at the rate of 7% per annum until paid, subject to the retention of $10,000.00 provided for in the policies of each of their respective insurers.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the above judgment also be and the same is hereby rendered in favor of said plaintiffs and against the employer of Darrell E. Gregory, Our Lady of Lourdes Hospital, and its insurer, Hartford Accident & Indemnity Company, under both of its policies issued to Our Lady of Lourdes Hospital, and against Bentley Laboratories, Inc., employer of Travis Bohannon, and its insurer, Gulf Insurance Company (subject to its policy limits of $100,000.00) and American Home Assurance Corporation (subject to its policy deductible of $100,000.00) jointly and in solido together with legal interest thereon from date of judicial demand at the rate of 7% per annum until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there by judgment rendered herein in the third party demand, as amended, in favor of Our Lady of Lourdes Hospital, Hartford Accident & Indemnity Company, and Darrell E. Gregory and against Travis R. Bohannon and American Home Assurance Corporation as his insurer (subject to the policy retention of $10,000.) jointly and in solido in contribution and for one-half of all amounts paid under the judgments rendered herein against said third party plaintiffs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment rendered herein in the third party demand, as amended, in favor of Our Lady of Lourdes Hospital, Hartford Accident & Indemnity Company and Darrell E. Gregory and against Bentley Laboratories, Inc., Gulf Insurance Company, (subject to its policy limits of $100,000.00) and American Home Assurance Corporation (subject to its policy deductible of $100,000.00) jointly and in solido in contribution and for one-half of all amounts paid under the judgment rendered against the said third party plaintiffs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that there be *210 judgment rendered herein in the pleadings styled reconventional demand in favor of Bentley Laboratories, Inc., Gulf Insurance Company and Travis R. Bohannon and American Home Assurance Corporation and against Darrell E. Gregory and Hartford Accident & Indemnity Company as his insurer jointly and in solido for contribution and one-half of all sums paid by said plaintiffs in reconvention to original plaintiffs herein under the aforesaid judgment.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in the pleadings styled reconventional demand in favor of Travis R. Bohannon, Bentley Laboratories, Inc., Gulf Insurance Company, and American Home Assurance Corporation and against Our Lady of Lourdes Hospital and Hartford Accident and Indemnity Company as its insurer jointly and in solido in contribution and for one-half of all sums paid by said plaintiffs in reconvention to original plaintiffs herein under the aforesaid judgment.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the demands presented by original plaintiffs against Dr. James R. Bozeman and Hartford Accident & Indemnity Company as his liability insurance carrier be, and they are hereby dismissed with full prejudice to the rights of plaintiffs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the demands by plaintiffs against Ronald DeBlanc, St. Paul Fire & Marine Insurance Company and Hartford Accident & Indemnity Company, as his liability insurance carrier, be and they are hereby dismissed with full prejudice to the rights of original plaintiffs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the demands by plaintiffs against our Lady of Lourdes Hospital and its liability carrier, Hartford Accident & Indemnity Company, and Bentley Laboratories, Inc., and Gulf Insurance and American Home Assurance Corporation as its liability insurance carriers for demands for acts of primary negligence independent of those of their respective employees, Darrell E. Gregory and Travis R. Bohannon be, and they are hereby dismissed with full prejudice to the rights of plaintiffs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the pleadings styled reconventional demand, as amended, filed by Travis R. Bohannon, Bentley Laboratories, Inc., Gulf Insurance Company and American Home Assurance Corporation against Ronald DeBlanc and St. Paul Fire & Marine Insurance Company be and the same are hereby dismissed with full prejudice to the rights of the aforesaid plaintiffs in reconvention.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the third party demand presented by Travis R. Bohannon, Bentley Laboratories, Inc., Gulf Insurance Company and American Home Assurance Corporation against Hartfored (sic) Accident & Indemnity Company as insurer of Dr. James R. Bozeman be, and the same are hereby dismissed with full prejudice to the rights of the aforesaid third party plaintiffs."
Appeals were perfected by the defendants, Darrell Gregory and his employer, Our Lady of Lourdes Hospital and its insurer, Hartford, and by defendants, Travis Bohannon, and his employer Bentley Laboratories, Inc., and its insurers, Gulf Insurance Company and American Home Assurance Corporation.[2] Plaintiffs answered the appeals asking for an increase in the amount of damages awarded.
As aforementioned the record reveals that Mr. Lorrie Ardoin was admitted to Our Lady of Lourdes Hospital by Dr. James Bozeman in order to undergo surgery on the morning of July 9, 1975. Mr. Ardoin had been complaining of chest pains, and, as *211 subsequent examinations showed, Mr. Ardoin was suffering from a coronary artery disease which obstructed and blocked the vessels that supplied blood to his heart. Based upon medical examinations of Mr. Ardoin's family physician and his own thorough examination, Dr. Bozeman admitted Mr. Ardoin to Our Lady of Lourdes Hospital to undergo a surgical procedure known as a coronary artery bypass.
Dr. Bozeman explained that a coronary artery bypass is an operation whereby a vein is taken out of the leg of the patient and is sutured to the vessel that is blocked so that the blood will bypass the area of blockage or obstruction. Following this operative procedure the blood flows through the vein that was taken from the leg and then flows into the vessel which supplies blood to the heart. A successful completion of the operation permits the blood to flow out of the heart of the patient through the new vessel, thereby bypassing the area of obstruction in the diseased vessel.
Because this surgical procedure requires that the heart be stopped and the vessel leading from the heart be cut, it is necessary to utilize what is known as a heart-lung machine to maintain the patient's life supporting functions during the operation. This equipment acts as the heart and lungs of the patient while the operation is proceeding.
Actually the heart-lung machine is a set up of two completely separate and distinct units, i. e., the perfusion pump and the perfusion software, the latter including the cardiotomy reservoir, the oxygenator, and the tubing that connects these parts and the patient to the system.
The pump is a versatile piece of equipment and is used not only as a life supporting mechanism in a coronary artery bypass but in many other varied surgical procedures. The perfusion pump used by Our Lady of Lourdes, which is distributed under the name of Travenol, consists of three (3) occlusive type roller heads, through which the tubing carrying the blood is threaded. When in operation, these roller heads turn and push the blood through the tubing, as the pump is designed so that it squeezes the lines through which the blood flows in such a manner that the blood never comes into direct contact with the pump. The pump, which has a stop, forward, and reverse position can cause the blood to flow either from the patient or to the patient, that is, the line will either pump or suck.
The perfusion software, which is disposed of after each operation, depends upon the operation of the pump for its life supporting services. When properly set up for a coronary artery bypass the entire system, the pump and software, forms a closed circuit with the circulatory system of the patient and bypasses the heart and lungs of the patient. To more particularly describe the perfusion software, there are two sets of tubing leading from the patient, each threaded through the pump roller heads and attached to the cardiotomy reservoir. The end of one of these lines is simply placed into the open chest cavity of the patient and draws blood from the area being operated on in order to keep the area clear for view. We shall refer to this line as the suction line. The end of the second line, which line we shall refer to as the venous line is placed into one of the ventricles of the heart. The purpose of this line is to divert the blood so that it does not enter the heart, but rather sucks it into the cardiotomy reservoir where the blood is filtered before it is pumped into the oxygenator. From the cardiotomy reservoir, the blood flows into the oxygenator which operates as the lungs of the patient. After the blood is oxygenated, another tube carries the blood from the oxygenator via the pump and back to the patient. This line is referred to as the arterial line. The end of this line is connected to the artery of the patient that flows from the heart and to the body of the patient. We again note that the pump in use by Our Lady of Lourdes had three roller heads, and when being used to perform a coronary artery bypass, all three roller heads are used. Through one roller head is threaded the venous line, through another is threaded the suction line, and through another is threaded the arterial line.
*212 The particular procedure briefly outlined above is known in the medical profession as cardiopulmonary perfusion. The person who operates the pump is known as the perfusionist.
Several years prior to Mr. Ardoin's death Our Lady of Lourdes Hospital began a program of open heart surgery. In preparation for this new type of surgery at the hospital special perfusionist training was provided by Our Lady of Lourdes to Darrell Gregory, a nurse-anesthetist in the hospital's employ. The training consisted of several weeks of "on the job training" with the open heart surgery team of Dr. Michael DeBakey in Houston. Mr. Gregory's training as a perfusionist in Houston was almost exclusively limited to the use of a Travenol pump and oxygenator, the same type of system that was used by Our Lady of Lourdes Hospital up until July 9, 1975.
As stated, prior to July 9, 1975, Our Lady of Lourdes Hospital was using a Travenol pump, as well as a Travenol oxygenator system, which included the cardiotomy reservoir and tubing. However, sometime around March of 1975 Dr. Gene Guinn of Houston, Texas, who often assisted Dr. Bozeman in Lafayette, recommended to the hospital and Darrell Gregory that because of the prepacking of the cardiotomy reservoir and tubing in the Bentley oxygenator system they ought to consider changing over from the Travenol software. Dr. Guinn was of the opinion that the Bentley system would save time in an emergency set up. Dr. Guinn also recommended to Travis Bohannon, Bentley Laboratories district manager in Houston, that he contact Our Lady of Lourdes Hospital. Shortly thereafter, on about March 10, 1975 Travis Bohannon traveled to Lafayette to meet with Darrell Gregory. At this meeting, at which Dr. Bozeman was present, Bohannon explained in technical detail the operation of the Bentley oxygenator and its attachments. He also presented a schematic diagram showing the tubing pac which could be custom ordered to meet the particular needs of the hospital. At this time Lourdes ordered 10 Bentley oxygenators and custom tubing pacs. Subsequently, Bohannon agreed in correspondence dated March 27, 1975 to come over and sit in on the first run or two with the new Bentley oxygenator. Bohannon's offer was accepted by Darrell Gregory who informed Bohannon that the hospital would begin their use of the new Bentley equipment on an operation scheduled for July 9, 1975.
We here note that Travis Bohannon, who was highly recommended by Dr. Guinn to Lourdes Hospital had, according to the Bentley Laboratories newsletter introduced as Lourdes Exhibit # 2, extensive experience in the medical equipment field. The newsletter further suggested to clients that they take advantage of Bentley's district manager's knowledge in this highly specialized field to help solve their clinical problems.
Travis Bohannon arrived at Our Lady of Lourdes Hospital on July 9, 1975, where he was met by Darrell Gregory. In preparing for the operation that morning both Gregory and Bohannon scrubbed and dressed in surgical garb. It was during this time that Bohannon informed Gregory that he was not there to run the pump but was there only to show him how the equipment was set up.
The parties then proceeded to the operating room and began unpacking the Bentley software. As the Bentley equipment was unpacked Bohannon identified each piece for Gregory showing him how it interrelated and how it was set up. Also in the operating room watching this procedure was Ronald DeBlanc, a nurse in the employ of Lourdes who was training under Gregory to be a perfusionist.
This procedure continued until Gregory prepared to thread the lines through the Travenol pump, at which point Gregory inquired of Bohannon if the lines he held were the venous and suction lines and where did they go. Bohannon replied that you hook up the lines the same way as you did the Travenol system. Gregory then threaded the venous and suction lines through the pump roller heads as he had previously done when using the Travenol *213 software. We digress at this point to note that according to the testimony of Darrell Gregory the directional switches controlling the roller heads on the Travenol pump were always maintained by him in a forward position, the heart-lung machine being started and stopped by use of a master switch and rheostat.
Once the surgery was underway the venous line was positioned in the heart by the surgeon, Dr. Bozeman. Dr. Bozeman then called for the sump, which was a command to the perfusionist to activate the pump thereby drawing the blood from the patient through the venous line and into the cardiotomy reservoir. However, instead of suctioning blood, the venous line pumped air into the heart of Mr. Ardoin. Mr. Ardoin died some one or two seconds later of a massive air embolism that reached the brain.
It is not disputed that considering the manner and direction in which the roller heads were threaded (left to right) in order for the venous line to such blood the directional switch controlling the venous line should have been placed in a reverse position. It is likewise not disputed that Darrell Gregory always threaded the Travenol software to the Travenol pump from left to right.
Appellants, Darrell Gregory, Our Lady of Lourdes Hospital and its insurer, Hartford, and appellants, Travis Bohannon, Bentley Laboratories, and its insurer Gulf and American Home, each contend that the trial jury erred in not finding that the other's negligence in setting up and/or operating the pump was the sole cause of Mr. Ardoin's death. Additionally, third party plaintiffs, Darrell Gregory, Our Lady of Lourdes and its insurer, Hartford, contend that the jury erred in determining that the product manufactured by Bentley Laboratories was free of defect in manufacture and/or design. All appellants to this litigation except Darrell E. Gregory, Ronald P. DeBlanc, Our Lady of Lourdes Hospital and Hartford Accident & Indemnity Company, contend that Dr. James Bozeman was concurrently negligent at the very least. On the other hand, there is no serious contention made by any of the appellants that Our Lady of Lourdes and Ronald DeBlanc, the trainee perfusionist, were guilty of independent acts of negligence.
Quite clearly the appellants are urging that this court determine that the factual findings and conclusions of the trial jury are manifestly erroneous.
It is well settled in the jurisprudence that the factual findings of the trial court should not be disturbed in the absence of manifest error. The guidelines to determine manifest error were set forth in Canter v. Koehring Company, 283 So.2d 716, 724 (La. 1973) as follows:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
Having hereinabove generally set forth the facts of this matter we are of the opinion that no good purpose would be served by further paraphrasing the evidence adduced on trial which was conducted over a period of some 12 days. Suffice it to say that our independent review and examination of the record, as made up, in light of the settled rule quoted above, reflects a reasonable factual basis supporting each of the special findings of the jury. Our examination and review of the record discloses *214 no manifest error in the jury's finding that Darrell Gregory and Travis Bohannon, and their respective employers under the theory of respondeat superior, were guilty of negligence which proximately caused the death of Lorrie Ardoin; that Ronald DeBlanc was not guilty of negligence; that Our Lady of Lourdes was not guilty of independent acts of negligence; that Dr. James Bozeman was not guilty of negligence; and, that the oxygenator manufactured by Bentley Laboratories, Inc. was free of any defect in design and/or manufacture.
Able counsel for the appellants complain that procedural errors were committed by the trial judge in disallowing certain testimony that may have conceivably altered the jury's findings. We turn now to a discussion of these alleged procedural errors and/or the effect thereof.
Appellants, Darrell Gregory, Our Lady of Lourdes and its insurer, Hartford, allege error in the trial court's ruling which severed their redhibition claim against Bentley Laboratories from the instant matter. LSA-C.C.P. Article 465 provides as follows:
"When the court is of the opinion that it would simplify the proceedings, would permit a more orderly disposition of the case, or would otherwise be in the interest of justice, at any time prior to trial, it may order a separate trial of cumulated actions, even if the cumulation is proper."
We find no abuse of the trial court's discretion in ordering the appellants' redhibition claim severed from the main demand in the instant matter.
These same appellants contend that the trial court committed error in refusing to submit certain special charges to the jury. Our review of these charges shows that they concerned in most part appellants' redhibition claim. The trial judge, having severed the redhibition claim prior to trial, and as we have determined properly so, committed no error in disallowing these jury charges.
The most serious issue presented on this appeal concerns the correctness of the trial judge's ruling which did not permit the trial jury to hear and consider the testimony of Dr. Prentiss Smith, a cardiovascular surgeon licensed to practice in the State of Louisiana, who was at the time of trial and prior thereto practicing his specialty at the Baton Rouge General Hospital. The testimony of Dr. Smith was offered on behalf of Bohannon, Bentley Laboratories, Gulf and American Home as tending to establish the degree or standard of care and skill ordinarily employed by cardiovascular surgeons, under similar circumstances, in coronary artery bypass operations. The testimony of Dr. Smith was timely objected to whereupon the trial judge sustained the objection holding that such testimony was inadmissible under the "locality rule" espoused in, among other cases, Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953). Able counsel for appellants, Bohannon, Bentley Laboratories, Gulf and American Home, contend that such ruling by the trial judge was erroneous, highly prejudicial, and constitutes reversible error.
Counsel for appellants also suggest reversible error in the trial judge's ruling which disallowed the testimony of Mrs. Peggy Bradley, Chief Perfusionist at the Baton Rouge General Hospital, and Edward Donnelly, Director of a school for perfusionists in Houston, Texas, which was offered to show the degree or standard of care and skill ordinarily employed by perfusionists, under similar circumstances, in such operations, and for the further purpose of establishing that the standard of care employed will not permit the perfusionist to delegate any authority whatever to another person, i.e., Bohannon.
As to the latter we conclude that irrespective of the correctness or incorrectness of the trial judge's ruling the defendants-appellants were not prejudiced and no reversible error has been shown. The trial jury determined that the perfusionist in charge on the occasion in question, Darrell Gregory, did not exercise the degree of care and skill ordinarily employed and was therefore negligent and liable to plaintiffs. We affirm this holding. As to his co-defendant, Ron DeBlanc, the record clearly *215 establishes that he was merely a trainee perfusionist and in no way responsible for the set-up or operation of the heart-lung machine. Accordingly, the trial jury found this defendant guilty of no negligence which proximately caused the death of plaintiffs' decedent. We affirm this holding. Finally, Mr. Bohannon is not a trained perfusionist and was not acting as such on the occasion in question. The testimony of Mrs. Bradley and Mr. Donnelly which was not permitted, could not possibly have been beneficial or detrimental to his cause. Mr. Bohannon was obviously found liable to plaintiffs because of his connection with the manufacturer of the oxygenator and his undertaking at the behest of the hospital purchaser with apparent assent of his employer to "set-up" this new equipment and "sit in on the first run or two . . .". We have affirmed this holding. For these reasons we discern no prejudice and no reversible error arising from the trial judge's ruling as to the testimony of Mrs. Bradley and Mr. Donnelly regardless of its correctness.
As aforestated the most serious issue concerns the correctness of the trial judge's ruling which disallowed the testimony of Dr. Smith. At the time the objection to Dr. Smith's testimony was sustained counsel for defendants-appellants made a statement, pursuant to the authority set forth in LSA-C.C.P. Article 1636, setting forth the nature of such evidence. The statement so made reads as follows, Tr. pgs. 2039-2042:
"OFFER OF PROOF BY MR. McNAMARA:
If the Court please, we would proffer the testimony of the doctor concerning the Number 1, if permitted to, the Doctor would testify concerning the similarity between the Baton Rouge General Hospital and that of Our Lady of Lourdes; they are similar institutions, located similar institutions, furnishing similar services with the same amount of beds or approximately the same amount of beds, same amount of diagnostic and emergency services offered; that the doctors testimony would then encompass the standard of care and practice of surgical protocol employed by the operating teams in that hospital to prevent just such an unfortunate occurrence as that involved here whereby first, the perfusionist threads the pump always conscious and checking visually to make sure of the line of flow and thereafter the tubing is capped and clamped at the pump and the pump turned on by the perfusionist and if the pump is sucking the tube will collapse, and if not, it will blow the end of the cap off; that in the operative field prior to the insertion of a sump line, one of the surgical team is, according to the protocol established, checks the actual line before insertion by dipping it into either blood or solution of sterile water to test to see whether the sump line is, in fact, sucking rather than pumping so as to avoid just this sort of tragedy. Finally, that further the doctor would testify that the good practice of standard of care requires that the patient be placed on the heart-lung machine and on full cardiopulmonary bypass prior to the insertion of any sump line into his heart to make sure that the machine is functioning properly and can support the vital life systems of the patient prior to stopping his heart to begin the surgery. We would further proffer in connection with the testimony of Ailene Frankenbergfirst, we proffer all of the testimony as to all original parties defendant and submit all is applicable to each inasmuch as this is one defendant putting on its case; this is also a part of our defense as well as part of our third party claim and, secondly, we are not the plaintiff in this case, as original plaintiff, we are a co-defendant to the doctor and each of the two perfusionists. Next we tender all of the testimony. In that connection, we would further tender her specific testimony regarding the fact that on occasion that she has seen members of the operating team perform a test by dipping same in the solution at the operative field prior or just prior to the insertion of the sump line into the patient as to the doctor and, further, we tender a proffer of her testimony concerning description *216 of medical facilities here in Lafayette which would show an analogy and similarity between the level of health care and standard of care employed and henceforth the standard of care employed in this community as opposed to other communities, as an appropriate standard that the community of Lafayette medically is of the same inparimateria (sic) with the medical community of the City of Baton Rouge with particular reference to the practices employed by cardiovascular surgeons operating in the city, in Lourdes as compared to Baton Rouge General and that is an appropriate standard of care to be employed in utilizing the testimony of the doctors. In addition and in connection with this proffer we have tendered to the Court a number of cases which show that where the community standard of care is negligent per se, then it is inappropriate and it will not inculpate a physician following same from liability. The doctor would testify that the procedure and practice employed by the Baton Rouge General Hospital in connection with cases of this nature is an appropriate feasible standard and one in which common sense, simple, reasonable conduct would dictate to be adopted by any surgeon performing this type of surgery, therefore, it should not be barred on the simple grounds of community standard of care because of the fact that the failure to do this, we feel, in connection with such a critical and dangerous potential to the patient and systemic circuit would require that any surgeon such as Dr. Bozeman adopt a test or procedure immediately prior to induction of the sump line into the heart of the patient to check to make sure he is not introducing air rather than suction into the ventricles or pumping chambers of the heart. The testimony of Dr. Prentiss Smith would outline such a procedure which is practical, feasible and appropriate to the matter; that there is a four-lane highway between Lafayette and Baton Rouge and that you can drive from Baton Rouge General to Lafayette General in forty minutes which is sometimes faster than you can get from General, Baton Rouge General to Our Lady of Lourdes Hospital."
Appellants contend that the proffered evidence is admissable and that the trial judge's ruling excluding same was error because (a) the ruling constitutes too narrow an interpretation of the "locality rule"; (b) that LSA-R.S. 9:2794A broadens the "locality rule" to the end that physicians practicing in a particular medical specialty are governed by the standard of care ordinarily practiced by physicians in the involved medical specialty, wheresoever located, and that such statute is here applicable although enacted subsequent to the occurrence giving rise to this litigation; and (c) such evidence was admissable as tending to show negligence per se under the holding in Favalora v. Aetna Casualty and Surety Company et al., 144 So.2d 544 (La.App. 1st Cir. 1962), writ denied Nov. 8, 1962.
DID THE TRIAL JUDGE CORRECTLY APPLY THE SO-CALLED "LOCALITY RULE"?
The standard or test to be applied in determining whether a medical practitioner's conduct in a given situation is negligent or not is well established by our jurisprudence. In Meyer v. St. Paul-Mercury Indemnity Company of St. Paul, Minnesota, 61 So.2d 901 (La.App. Orleans 1952), affirmed at 225 La. 618, 73 So.2d 781, 782 (1953) this standard or test was stated to be as follows:
"A physician, surgeon, or dentist, according to the jurisprudence of this court and the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment in the application of his skill to the case." (citations omittedemphasis ours)
*217 The instant case arises as a result of a surgical operation performed at Our Lady of Lourdes Hospital in Lafayette, Louisiana. Appellants sought to introduce evidence as to the standard of care practiced by cardiovascular surgeons in Baton Rouge, Louisiana, and particularly and more specifically as practiced at the Baton Rouge General Hospital. The evidence was ruled inadmissable.
The record reflects that the City of Lafayette and the City of Baton Rouge are not comparable in size, Baton Rouge being the larger of the two. The City of Lafayette is however, one of the larger metropolitan areas in Southwest Louisiana. The two cities are situated some sixty miles apart. The evidence does show that Baton Rouge General Hospital and Our Lady of Lourdes Hospital are comparable in size and services offered. Finally, the record shows that there are three other physicians in the City of Lafayette besides Dr. Bozeman who specialize in cardiovascular surgery and who perform the identical operation as was to be performed on Mr. Ardoin. Considering this evidence the trial judge ruled Dr. Smith's testimony inadmissable holding that under Meyer, supra, the duty or standard of care owed by a surgeon practicing in the City of Lafayette is to exercise the degree of skill ordinarily employed under similar circumstances, by members of the medical profession in Lafayette. The trial court rejected appellants' contention that the City of Baton Rouge was within the "locality" of the City of Lafayette. We conclude that this ruling of the trial court is correct.
Although the term "locality" may be susceptible of a large number of definitions and meanings we believe that its meaning in a given situation must be controlled by the context. We do not believe that the appellate courts of this state, in stating the rule applicable in medical malpractice cases, necessarily intended to broaden the geographical area of consideration by the addition of the words "or locality" following the words "in the same community". In instances where it is shown that the community in question is large both geographically and population wise; has medical facilities and services comparable to its size; and, a sufficient number of physicians and surgeons practicing the same medical specialty from which can be formulated a standard of skill ordinarily employed we conclude that the term "locality" as used in the stated rule is equivalent to or synonymous with "community". To decide otherwise would do violence to the stated rule and to the rationale which prompted its adoption and consistent application. The reason or rationale behind the formulation of this rule was well stated in Favalora, supra, as follows:
"The rationale of the general rule which exempts from liability the physician or surgeon who employs the degree of care and skill ordinarily employed, under similar circumstances, by members of his profession in good standing in the community, is founded upon recognition of the fundamental truth that all individuals in the same profession (or any field thereof) are not endowed with the same degree of skill, ability, competence and proficiency. The rule rightfully makes allowance for the difference in human intelligence and the well known fact that the Divine Creator has seen fit to bestow upon His creatures varying degrees of ability and talent. It also takes into consideration the obvious fact that all members of the medical profession do not possess skill equal to their most learned and gifted brothers. In short, the general rule applicable herein makes allowance for the fact that not all medical authorities are equal in ability; it does not require of every member of the profession competence equal to the best but only that he follow those practices indulged in by similar practitioners in his locality exercising the greatest skill of which he individually is capable and at the same time exercising reasonable care and diligence together with his best judgment in the application of the skill he possesses."
Another reason for the "locality rule" stems from the known fact that the practice, *218 procedure and protocol followed by members of the medical profession in good standing in a given situation will vary appreciably from one community or locality to the other and even from one physician to the next. Medical practitioners adopt differing procedures because in their individual medical judgment such procedure best suits a patient's needs. In most cases the practice or procedure adopted assures the patient a high degree of care and diligence. In instances where it does not the rule cannot be availed of as a defense.[3]
For the above reasons we conclude that the trial judge in rejecting the testimony of Dr. Prentiss Smith correctly applied the so-called "locality rule".
LSA-R.S. 9:2794; ITS EFFECT; AND, ITS ALLEGED APPLICATION TO THE CASE AT BAR.
The cited statute which was enacted in the year 1975, subsequent to the incident giving rise to this suit, reads as follows:
"§ 2794. Physicians and dentists; malpractice; burden of proof; jury charge
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing in the same community or locality to that in which the defendant practices; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
B. Any party to the action will have the right to subpoena any physician or dentist either for a deposition and/or testimony for trial to establish the degree of knowledge or skill possessed or degree of care ordinarily exercised as described above without obtaining the consent of the physician or dentist who is going to be subpoenaed. The fee of the physician or dentist called for deposition and/or testimony under this Section will be set by the court.
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician or dentist. The jury shall be further instructed that injury alone does not raise a presumption of the physician's or dentist's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable."
Counsel for Bohannon, Bentley Laboratories, Gulf and American Home contend that the quoted statute had the effect of broadening the "locality rule" to the end that physicians practicing in a particular medical specialty are governed by the standard of care ordinarily practiced by physicians in the involved medical specialty, wheresoever located, and that such statute is applicable although enacted subsequent to the date of Mr. Ardoin's death. Accordingly, appellants contend that the testimony of Dr. Smith was admissable under authority of this statute and that the trial judge erred in refusing to permit such testimony.
*219 We do not consider whether the cited statute may be applied retroactively for we conclude that even if the cited statute is applicable to the case at bar it would be of no avail to appellants.
We do not construe LSA-R.S. 9:2794 as abrogating the "locality rule" insofar as medical specialists are concerned. To the contrary, as we read and interpret the statute it further restricts the rule by making it statutorily applicable to medical specialties. The initial phrase in sub-section A(1) modifies the second phrase in that sub-section to the end that plaintiff's burden in a malpractice suit involving alleged acts of medical negligence peculiar to a particular medical specialty is to prove the degree of care ordinarily practiced by physicians within the involved medical specialty "in the same community or locality to that in which the defendant practices".
Although we discern no ambiguity in the statute, even if it be considered susceptible of two constructions, we would construe same as limiting rather than broadening or abrogating the "locality rule" insofar as applicable to medical specialties. It is well settled that in construing a statute niceties of grammatical rules and use of words, punctuation or placement of phrases may not be so strictly adhered to as to obscure the true meaning of the law and thwart the legislative intent. Finn v. Employers' Liability Assurance Corporation, 144 So.2d 852 (La.App. 2nd Cir. 1962) and cases therein cited. The cardinal principle of statutory construction is to ascertain legislative intent. As stated in State v. Seals, 255 La. 1005, 233 So.2d 914, 918 (1970):
"The object of a court in construing a statute is to ascertain the legislative intent and interpret the laws so as to give them the connotation the lawmaker obviously intended and not to construe them so rigidly as to give them preposterous or odd meanings. Dore v. Tugwell, 228 La. 807, 84 So.2d 199."
That it was the legislative intent to restrict rather than broaden the right of recovery of injured plaintiffs in medical malpractice cases by the adoption of LSA-R.S. 9:2794 can hardly be argued. At the time this statute was adopted the legislature also adopted several statutes directed toward retarding the rising number of malpractice claims, curbing the proportion that may be successful, and checking increases in the amounts awarded. LSA-R.S. 9:2792, 2793 and 2794; LSA-R.S. 40:1299.41 et seq. In speaking to the effect of LSA-R.S. 9:2794 it is stated in 50 T.L.R. 655, 674 and 675:
"Traditionally, the duty imposed upon health-care providers has been to meet the standard of performance ordinarily expected for normal treatment in the local community. The courts, however, have steadily broadened the geographical basis by allowing evidence of the most progressive medical procedures available. This judicial relaxation of the locality rule has often held doctors to a higher standard, making an injured patient's proof of negligence a far easier burden to carry, in part by reducing adverse effects arising from a conspiracy of silence among expert witnesses in a community. To prevent further erosion of the locality rule, the Louisiana Legislature has declared that the ordinary medical procedures of the community in which a physician practices will determine the degree of proficiency required of him. By statutorily preserving the locality rule, this provision is intended to establish a standard health-care providers are likely to meet with regularity, thus insulating them from liability. As calculated, even where local procedures fall drastically short of the best known medical care, negligence will be difficult to prove and, as a result, will be found less frequently."
For the above reasons we conclude that the proffered evidence was not admissable under LSA-R.S. 9:2794.
WAS THE PROFFERED EVIDENCE ADMISSABLE UNDER FAVALORA V. AETNA CASUALTY AND SURETY COMPANY ET AL., SUPRA?
Appellants finally contend that the testimony of Dr. Smith was admissable under *220 Favalora v. Aetna Casualty and Surety Company et al., supra, as tending to show that the procedure followed by Dr. Bozeman failed to meet the test of reasonable care and diligence required of the medical profession. In Favalora, supra, our brethren of the First Circuit, although acknowledging viability of the "locality rule", concluded that such rule could not be availed of as a defense when the criterion relied upon is shown to constitute negligence in that the criterion (standard of care) fails to guard against injury to the patient from a reasonably foreseeable contingency. In so holding Judge Landry, as the organ of the court, stated:
"To relieve a member of the medical profession from liability for injury to a patient on the ground that he followed a degree or standard of care practiced by others in the same locality is, in our opinion, unthinkable when the degree or standard of care in question is shown to constitute negligence because it fails to meet the test of reasonable care and diligence required of the medical profession. . .
In Favalora, supra, the court determined that the standard of care at issue in that case constituted negligence and failed to meet the test of reasonable care and diligence because (a) the circumstance which occurred during the medical procedure there involved (fainting causing injury to the patient) was a foreseeable contingency which occurred with frequency; (b) medical evidence in the record, given by a physician practicing in defendant's locality, indicated that the practice followed (failure of radiologist to secure patient's medical history) was faulty; and, (c) the fainting of a patient during the type of x-ray examination then being conducted was a foreseeable contingency cautioned against in all medical training. The legal proposition espoused in Favalora, supra, was re-affirmed although distinguished in Fontenot v. Aetna Casualty & Surety Co., 166 So.2d 299 (La.App. 1st Cir. 1964) and in Slack v. Fleet, 242 So.2d 650 (La.App. 1st Cir. 1970). In the last cited cases the rule of Favalora, supra, was held inapplicable because the record failed to indicate that the injury sustained was a foreseeable contingency occurring with frequency nor was there evidence that the procedure was faulty or that the contingency causing injury was cautioned against in training.
We have previously quoted the statement proffered by counsel for Bohannon, Bentley Laboratories, Gulf and American Home. This statement, which sets forth the nature of the evidence sought to be introduced, generally describes the practice and procedure followed by an operating team in the Baton Rouge General Hospital, including the functions performed by the cardiovascular surgeon and the perfusionist. Although the procedure followed by the perfusionist in Baton Rouge appears to differ somewhat from that followed by perfusionists in Lafayette, the statement indicates no great degree of variance in the procedure employed by the cardiovascular surgeon. In any event, it is not made to appear in the proffered statement that Dr. Smith intended to testify that the procedure followed by Lafayette cardiovascular surgeons was in any way faulty or that the incident causing Mr. Ardoin's death was a foreseeable contingency occurring with frequency, or that the procedure followed was contrary to what members of the medical profession practicing in that specialty are taught in training. In short, there is nothing in the proffered statement indicating that Dr. Prentiss intended to testify that the procedure followed failed to meet the test of reasonable care and diligence required of the medical profession. For these reasons we find Favalora, supra, inapplicable. Considering this conclusion we express no opinion concerning the possible effect of LSA-R.S. 9:2794 on the holding in Favalora, supra.
For all of the above reasons we find the ruling of the trial court which disallowed the testimony of Dr. Prentiss Smith, Mrs. Peggy Bradley and Mr. Edward Donnelly to be correct.
The next issue raised concerns the trial judge's alleged error in allowing the jury to view the various insurance policies *221 which afforded coverage to defendants which in effect informed the members of the jury of the policy limits of the several insurers involved. In the very recent case of Priscilla Domingue v. Continental Insurance Company et al., 348 So.2d 209 (La.App. 3rd Cir. 1977) a different panel of this court, with one Judge dissenting,[4] concluded that such action was proper. The members of this panel, other than Judge Culpepper, neither approve nor disapprove of this holding, rather we determine, for the reasons hereinafter more fully set forth in our discussion of the issue of quantum, that in this case regardless of the correctness or incorrectness of the lower court's ruling defendants-appellants were not prejudiced and no reversible error is shown.
The next issue concerns correctness of the formal written judgment of the trial court insofar as it casts American Home as the insurer of Travis Bohannon and liable in solido with him on the principal demand and on the third party demand of Our Lady of Lourdes Hospital, Hartford and Gregory. As we understand the issue, which is presented for the first time on appeal, American contends that Travis Bohannon was an "executive officer" of Bentley; that the policy issued by Gulf Insurance Company includes coverage for "executive officers"; and, accordingly, Gulf should have been cast as the insurer of Bohannon.
The question of Bohannon's insurance coverage, whether he had any at all and if so whether it was provided by Gulf's or American Home's policy, was not made an issue in the trial court and presumably only surfaced following trial and rendition by the jury of its special findings.
There does not seem to be any question but that Gulf's policy provides primary coverage to Bentley Laboratories and its executive officers and that American Home's policy provides Bentley Laboratories and its executive officers excess insurance over and above that provided by Gulf. We also understand that the parties virtually concede that although the American Home policy is excess insurance insofar as Bentley Laboratories and its executive officers are concerned that it provides primary coverage to Bentley Laboratories' employees. This latter fact apparently went unnoticed until after the trial had been completed and apparently became an issue only later when the formal judgment for signature by the trial judge was being prepared.
Gulf contends that the judgment of the trial court is correct insofar as it casts American Home as the insurer of Bohannon. On the other hand, as aforesaid, American Home contends that Gulf's policy provides primary coverage for Bohannon because of his executive officer status.
In the alternative, American Home contends in brief that since the position of Gulf before and all through the trial was that it was the primary insurer and that American Home was excess only and the case was fully tried on that basis with Gulf providing a defense not only for Bentley Laboratories but also for Bohannon[5] that Gulf is now estopped to now change its position. In connection with this alternative contention, counsel for American Home has appended an affidavit to his appellate brief which recites alleged facts in support thereof. Gulf has filed a motion to strike this affidavit.
We see no merit whatever in American Home's alternative contention insofar as this litigation is concerned. Clearly, any equities between American Home and Gulf which might form the basis of an estoppel, cannot affect plaintiffs' right or the right of third party plaintiffs, Lourdes, Gregory and Hartford, to have American Home cast in judgment, if in fact it is the insurer of Bohannon. Likewise, equities as between American Home and Gulf cannot form the *222 basis for a valid judgment in favor of plaintiffs and the named third party plaintiffs against Gulf, if in fact it is not the insurer of Travis Bohannon. We of course express no opinion concerning this alternative contention except to observe that it can have no relevance whatever insofar as this litigation is concerned. Having so concluded the motion to strike is moot.
We do find merit, however, in American Home's principal contention and for the reasons hereinafter set forth we will remand this matter to the trial court for trial of the issue as to whether coverage is provided to Travis Bohannon under either or both the American Home policy and/or the policy of insurance issued by Gulf Insurance Company.
This matter was tried to a jury pursuant to demand made under the provisions of LSA-C.C.P. Article 1732. The trial to the jury was on all issues (LSA-C.C.P. Article 1735) except that at the time of trial the following pertinent stipulations as to insurance coverage were made (Tr. pgs. 2189 and 2190):
". . .
BY MR. McNAMARA:[6]
It is stipulated by and between all parties for counsel of record that if, in the event the jury should find that Travis Bohannon was guilty of negligence which was the proximate cause of the death of Lorrie Ardoin then both Gulf Insurance Company and American Home Assurance Company, as insurers of Bentley Laboratories would be responsible for the liability of Bentley Laboratories in that respect.
BY MR. GUGLIELMO:[7]
It is stipulated, set forth and understood that by agreeing to the above stipulation that no admission is in any way made whether or not Travis Bohannon has personal liability insurance coverage or not that the stipulation deals only with the issue responde superiorae (sic)."
It is obvious from the above stipulations that American Home did not stipulate that its policy provided coverage for Mr. Bohannon although it did stipulate as to its responsibility under respondeat superior. The question as to whether Bohannon was individually insured and if so under which of the policies, i.e., the Gulf policy or the American Home policy, was clearly an issue for determination by the jury, although for reasons previously set forth presumably this was not brought to the attention of the jury or the trial judge conducting the trial. The policies of insurance were introduced in evidence. At the completion of trial the matter was submitted to the jury on special verdicts prepared by the trial judge pursuant to the authority contained in LSA-C. C.P. Article 1811. The trial jury was not required to return a special verdict with regard to this coverage issue. In fact no mention whatever appears in the special verdicts as to insurance coverage. In short these special verdicts (Tr. Pgs. 934 and 935) and the record as a whole leaves no doubt but that the jury never considered or decided the issue of coverage as between Gulf and American Home. Following the jury verdict the trial court rendered judgment, however, said judgment as prepared, rendered and signed cast American Home as the insurer of Travis Bohannon. Clearly this was not an issue for determination by the trial judge and the judgment rendered and signed was, to that extent, not in conformity with the special findings of the jury (LSA-C.C.P. Article 1916) or with the stipulation of the parties (LSA-C.C.P. Article 1735).
We are keenly aware of the provisions of LSA-C.C.P. Article 2164, and the jurisprudence interpreting this article, which permits an appellate court to render a judgment which is just, legal and proper upon the record even though no ruling was made on a particular issue by the trial court, however, such authority should be assumed only when the record contains all the evidence necessary to determine the question. Further, this authority should *223 only be exercised in instances where the defendant's liability, which is dependent on that undisposed of issue, is authoritatively adjudicated in the trial court judgment. We have previously demonstrated that the trial court judgment insofar as it casts American Home as the insurer of Travis Bohannon is not in accord with the provisions of LSA-C.C.P. Article 1916 which mandates that the trial judge sign a judgment in accordance with the jury's special verdicts. In addition, the record clearly indicates that this question of coverage only came to the attention of all parties after trial of the case and consequently all the evidence necessary to determine the question of coverage as between Gulf and American Home is not in the record. We therefore believe, for the above reasons, that substantial justice would best be achieved by remanding this matter to the trial court for further proceedings directed solely to the issue of insurance coverage of Travis Bohannon as between Gulf Insurance Company and American Home Assurance Company.

QUANTUM
We have previously indicated the amount of the awards made to Dorothy Hebert Ardoin, surviving spouse of Lorrie Ardoin, as well as the awards made to the minor and major children. Appellants contend that these awards are excessive and in support thereof appellants rely solely on several cited cases wherein the courts of this state have granted lower awards under somewhat similar circumstances. On the other hand, as aforesaid, plaintiffs seek an increase in these awards.
In Miller v. Thomas, 258 La. 285, 246 So.2d 16, 19 (1971) the court reaffirmed the well settled principle that in assessing damages much discretion must be left to the judge or jury. The court in Miller v. Thomas, supra, stated in this regard:
"From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the `much discretion' accorded by the codal provisions; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity."
In the case of Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977) the court re-emphasizing these principles stated:
"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award . . .
Further we believe that, heretofore, courts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal. Of course, another factor bearing on this matter is that significant change has been been, and is taking place in our society not the least of which are changes in economic conditions (particularly rampant inflation), fluctuating job categories, employment opportunities, and even lifestyles. Furthermore, it is impossible for an appellate court to judge what evidence in a particular case was given special weight by the finder of fact."
In the recent case of Schexnayder v. Carpenter, 346 So.2d 196 (La.1977) our Supreme Court set forth the procedure for testing whether the jury abused its discretion as follows:
"Since the jury does have, under the law, much discretion in fixing damages, the appropriate procedure for testing whether the jury abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury."
We have carefully examined the record in light of the enunciated principles and find no abuse of the much discretion allowed the trier of fact. In short, the evidence in the record, under an interpretation *224 thereof most favorable to plaintiff, which reasonably could have been made by the jury, leads us to the conclusion that the awards made to Dorothy Hebert Ardoin and her major and minor children were neither excessive nor inadequate. Accordingly we affirm each of the awards made.
For the above and foregoing reasons the judgment of the trial court rendered in favor of plaintiffs and third party plaintiffs, Our Lady of Lourdes Hospital, Hartford Accident & Indemnity Company and Darrell E. Gregory and against American Home Assurance Corporation, as the insurer of Travis R. Bohannon, be and the same is hereby reversed and set aside and this matter is remanded for further proceedings directed solely to the issue of insurance coverage provided to Travis R. Bohannon under either or both of the policies of insurance issued by Gulf Insurance Company and/or American Home Assurance Corporation, all pursuant to the views herein expressed. In all other respects the judgment of the trial court is affirmed.
All costs incurred by this appeal are to be borne by appellants.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
NOTES
[1] Dorothy Hebert Ardoin, the surviving spouse of the decedent Lorrie Ardoin institutes this suit in her individual capacity and as tutrix of her three minor children, Michelle Ardoin, Renee Ardoin, and Lorrie D. Ardoin, Jr., for loss of love and affection and loss of economic support. The six remaining major children, Gerald W. Ardoin, Larry M. Ardoin, Kenneth J. Ardoin, Karen Ardoin, Loraine Ardoin, and Denise Ardoin seek only to recover for the loss of love and affection of their father.
[2] American Home questions the overall correctness of the judgment and in addition alleges error in the judgment insofar as it casts American Home as the primary insurer of Travis Bohannon.
[3] We do not deem it necessary to at this point discuss LSA-R.S. 9:2794 and its possible effect on the holding of Favalora v. Aetna Casualty & Surety Company et al., supra.
[4] Judge Culpepper who sits as a member of this panel was the dissenting judge in Domingue v. Continental Insurance Company et al., supra.
[5] The record indicates that Bohannon was represented at trial by the attorney representing Gulf Insurance Company. It was not until judgment was rendered and a motion for new trial was made that new counsel for Bohannon appeared.
[6] Mr. McNamara appears as counsel of record for Bohannon, Bentley Laboratories and Gulf.
[7] Mr. Guglielmo appears as counsel of record for American Home Assurance Corporation.